In re CONSOLIDATED AUTO RECY-
CLERS, INC., and Consolidated Auto
Recyclers of Massachusetts, Inc., Debt-
ors.

Nos. 90–10445, 90–10499.

United States Bankruptcy Court,
D. Maine.

Jan. 11, 1991.

Daniel Amory, Benjamin E. Marcus, Drummond, Woodsum, Plimpton & MacMahon, Portland, Me., for Walter Swenson.

Anthony E. Perkins, Gregory A. Tselikis, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for Allied Capital Corporation.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

### 1. *Introduction.*

Before the court is the motion of Allied Capital Corporation [1] ("Allied") to dismiss Consolidated Auto Recyclers of Massachusetts Chapter 11 case. Allied contends that Consolidated Auto Recyclers of Massachusetts, Inc. (CARM), was unlawfully made the subject of bankruptcy proceedings through the unauthorized actions of the bankruptcy trustee of Consolidated Auto Recyclers, Inc. (CAR), CARM's parent and sole shareholder.

Allied urges that dismissal is required because the parent corporation's trustee was not empowered, as a matter of corporate authority, to initiate proceedings for its subsidiary. In addition, Allied urges that CAR's trustee's action in filing a voluntary petition for the subsidiary was an extraordinary action, beyond the permission to operate the debtor's business granted by 11 U.S.C. §§ 363(c)(1) and 1108, and, therefore, that prior notice, hearing and authorization pursuant to 11 U.S.C. § 363(b) was required to imbue the filing with lawful authority.

The trustee, in turn, argues that, as a matter of corporate law, the bankruptcy filing was authorized and, in any event, through its participation in the affairs of the parent and the subsidiary, Allied is estopped from complaining or has waived objection to the bankruptcy filing. On the bankruptcy law front, the trustee contends that prior authority was not required for filing the subsidiary's petition and, alternatively, that if such authorization were indispensable, it can be granted *nunc pro tunc.* The trustee has filed a motion seeking *nunc pro tunc* authority to initiate the subsidiary's bankruptcy, should the court find that authority was wanting on the date that the petition was filed. Allied has objected.

Before resolving the issues raised by the motions, a brief discussion of the procedural history of the cases is in order.

### 2. *Procedural History.*

The docket reveals that CAR filed a voluntary petition invoking relief under Chapter 11 on July 27, 1990. The petition was accompanied by a shareholder's resolution authorizing CAR's chief executive officer

---

**1.** Allied Capital Corporation is a Washington, D.C. based venture capital firm. It operates its affairs with and through affiliated entities, including Allied Investment Corporation, Allied Investment Corporation II, Allied Venture Partnership and Allied Technology Partnership. Although some or all of the Allied entities were named parties and signatories to agreements with CAR and CARM, their number and separate existences were not of material significance in the transactions. Thus, the multiple Allied corporations and partnerships will be referred to collectively as "Allied" throughout this opinion.

to initiate bankruptcy proceedings.[2] The filing was initially met with a motion to dismiss filed by Rodney P. Rodrigue, Wayne E. Bowers, and John M. Robichaud (the "Principals"), shareholders of CAR who were active in the business from its early days. The United States Trustee moved for appointment of a trustee on an expedited basis and, ultimately, the Principals withdrew their motion to dismiss and consented to the trustee's appointment. On August 9, 1990, Walter C. Swenson, Jr., was appointed as CAR's trustee.

On August 22, 1990, Trustee Swenson filed a voluntary Chapter 11 petition for CARM and sought appointment of a trustee and joint administration with the estate of CAR. Allied objected to appointment of the trustee and moved for dismissal of the CARM case. On September 5, 1990, Swenson was appointed trustee for CARM without prejudice to Allied's right to seek dismissal. An order for joint administration was entered at that time.

Allied pursued its motion to dismiss. Evidentiary hearings were conducted on October 4 and December 17, 1990. In the course of the December 17 hearings, counsel for the trustee moved orally for an order granting the trustee authority, *nunc pro tunc*, to file the CARM bankruptcy petition. At the court's direction, a written motion was filed on December 19, 1990.[3]

In support of the motion to dismiss, Allied presented the testimony of Frederick L. Russell, Jr., its senior vice-president, and the testimony of Ralph Dyer, who served as chairman of the board and chief executive officer of CAR from July 2, 1990, until he was relieved of duties by the trustee on August 14, 1990. The trustee testified in opposition to the motion.

Based upon the testimony adduced at the evidentiary hearings, and the exhibits in evidence,[4] the court today enters the following findings of fact and conclusions of law.

## Findings of Fact

CAR is a corporation organized and existing under the laws of the State of Delaware. CARM was incorporated in March 1990, also under Delaware law.[5]

On October 30, 1989, CAR signed an agreement (the "Investment Agreement") calling for a $3,000,000.00 loan from Allied, secured by mortgages, a security interest in personal property, assignments of contract rights, collateral assignments of leases, assignments of life insurance policies on the Principals and a stock pledge.[6] The Investment Agreement was amended on December 8, 1989, to add another Allied entity to the group providing credit to CAR.[7] Subsequently, the parties negotiated a second amendment which provided for a "bridge loan" of $900,000.00 and called for a revision of the stock pledge established under the Investment Agreement.[8]

CARM issued 100 shares of its stock to CAR on March 29, 1990. CARM's stock transfer ledger shows no other shares issued at any time prior to August 22, 1990, and reveals that the originally-issued 100

---

2. The resolution, dated July 24, 1990, represents the consent of 70% of CAR's shareholders, that percentage being the CAR stock held by Allied. *See* discussion *infra* at n. 31.

3. The motion was accompanied by a motion seeking to shorten the time for filing a response to December 21, 1990. At Allied's request, the time for filing a response was set at December 28, 1990.

4. By stipulation, exhibits put in evidence on September 14, 1990, during a hearing addressing the trustee's motion for authority to use cash collateral, have been included in the record upon which the instant motions are being decided.

5. CARM's certificate of incorporation was filed in the office of the State of Delaware's Secretary of State on March 26, 1990. Endorsed Certificate of Incorporation, Exhibit M–24.

6. Investment Agreement, Exhibit R–2, dated October 30, 1989.

7. Amendment to Investment Agreement, Exhibit R–3.

8. Second Amendment to Investment Agreement, Exhibit R–4.

shares remain registered in the name of CAR.[9]

By-laws for CARM were adopted on March 28, 1990.[10] Those by-laws provided for a board of directors of not less than three nor more than fifteen members; the number of directors was to be fixed from time to time by board resolution.[11] Any director or the entire board could be removed, with or without cause, by the holders of a majority of the shares entitled to vote upon an election of directors.[12]

A third amendment to the Investment Agreement was effected on March 30, 1990. It added provisions relating to CARM. Under the third amendment, CARM borrowed $500,000.00 from Allied, evidenced by two $250,000.00 senior secured notes. The obligation carried interest at 15% and was payable in monthly, interest-only installments, with the entire principal due on December 31, 1990.[13] The $500,000.00 obligation was secured by a security interest in all of CARM's assets and by a pledge of CARM's stock.[14] It was guaranteed by CAR. To further secure its obligations to Allied, CARM executed a separate assignment of accounts and contract rights, dated April 1, 1990.[15] The third amendment also provided that CAR was to have a board of no more than five directors, and that Allied would place two directors on the board.[16]

Although $10,000.00 in closing costs allocable to the extension of credit to CARM was paid at closing, CARM made no payments of principal or interest to Allied at any time before the petition was filed on its behalf.[17] Under the terms of the notes, failure to pay monthly interest obligations constituted a default and could trigger acceleration and other remedies.[18]

On June 19, 1990, Allied gave notice of CARM's default and stated that it intended to sell the pledged CARM stock at public auction:

> As you know, Consolidated Auto Recyclers of Massachusetts, Inc. ("CARM") has come into default under its loans from the Allied companies. Under the CARM Stock Pledge Agreement between Consolidated Auto Recyclers, Inc. ("CAR") and Allied Investment Corporation and Allied Investment Corporation II ("Allied") dated March 30, 1990, CAR has pledged 100% of the capital stock of CARM as collateral for the $500,000.00 Senior Secured Notes dated March 30, 1990. This letter is to advise you that Allied is bringing the subject common stock shares to foreclosure at public auction.[19]

The June 19 letter accelerated the senior secured note obligations and provided that, unless those obligations were paid in full, the shares would be sold at auction on Monday, July 2, 1990. Paragraph E of the letter explained:

> Effect of sale: The sale *will divest* CAR of all its rights, interest and ownership in each of the shares sold; should the sale proceeds be insufficient to pay the Senior Notes in full (including principal, interest

9. CARM Stock Transfer Ledger, Exhibit M–19.

10. Consent of Sole Incorporator in Lieu of Organizational Meeting, Exhibit M–22.

11. Although the number of directors could be increased or decreased from time to time, the "no decrease shall have the effect of shortening the terms of any incumbent director." CARM By-laws, Article II, Section 1, *Id.*

12. CARM By-laws, Article II, Section 4, *Id.*

13. Third Amendment to Investment Agreement, Exhibit R–5. The notes themselves, also dated March 30, 1990, are in evidence as Exhibit R–10.

14. Third Amendment to Investment Agreement, *supra*, CAR guaranty of CARM, dated April 17, 1990, Exhibit R–8; and CARM Stock Pledge Agreement, Exhibit R–7.

15. Exhibit R–6.

16. Third Amendment to Investment Agreement, paragraph 5, *supra*.

17. Ledger cards for the $250,000.00 notes, Exhibit R–11; testimony of F. Russell.

18. Senior secured note, Exhibit R–10. Allied contends that additional defaults occurred after June 28, 1990, including the exit of Messrs. Robichaud and Rodrigue from the CAR/CARM business.

19. Allied Capital Corporation letter dated June 19, 1990, Exhibit R–12.

and all costs and expenses of sale), CARM and its guarantors will be liable for the deficiency....[20] (Emphasis supplied.)

As noted, the foreclosure sale of the CARM shares was a consequence of the CARM Stock Pledge Agreement. That agreement, which bears the signatures of corporate officers of CARM and CAR indicates that the pledged shares were to serve as security for CARM's indebtedness to Allied and describes the remedies available upon default, including the right to sell the shares at auction on ten days' notice to CAR. Paragraph 6 of the pledge provides:

> During the term of this CARM Stock Pledge Agreement, if no default has occurred under the Debt, the stock holders shall retain the right to vote the subject shares on all corporate questions, and the secured party or any purchaser at any foreclosure sale shall, if necessary, execute due and timely proxies in favor of the undersigned upon request.[21]

Allied's declaration of default and notification of its intent to foreclose on the CARM shares sparked a new round of discussions among the parties, culminating in what was termed the "midnight agreement,"[22] executed in the wee hours of June 28, 1990, after many hours of negotiation.[23]

Among other things, the agreement called for an expansion to seven members of the CAR and CARM boards of directors[24] and for retention of Mr. Ralph Dyer as CAR's chief executive officer, with weekly reporting duties to the CAR board.

Through December 31, 1991, three members of the CAR board were to be nominees of Allied and the Principals were to hold three seats. CEO Dyer would be the seventh board member, serving as a "tie breaker". The parties agreed that CAR's by-laws would be amended to provide that board action would require a majority vote. In order to retain the tie breaker's role, they also agreed that the "respective representatives" of the parties on the CAR board would abstain from voting at board meetings to the extent that "such party's representatives outnumber the other party's representatives...."[25]

The midnight agreement also provided for Allied's exercise of warrants to acquire 70% of CAR's stock[26] and for Allied to forego the scheduled sale of the pledged CARM stock.[27] The letter does not expressly waive or preserve the defaults previously declared by Allied on the CARM obligations.

On July 23, 1990, what was purported to be a "regular meeting" of the board of

20. *Id.*

21. CARM Stock Pledge Agreement, Paragraph 6, Exhibit R–7.

22. Letter dated June 28, 1990, from Messrs. Robichaud, Rodrigue and Bowers to Allied Capital Corporation, Exhibit R–13.

23. In addition to bearing the signatures of Messrs. Rodrigue, Bowers and Robichaud, signatures are affixed indicating that the document's terms were agreed to and accepted by Allied and by CAR. *Id.*

24. The board expansions were effected by shareholder actions in lieu of meeting, dated June 27, 1990. That the shareholder actions, which also elect three Allied members, the three Principals and Mr. Dyer to both boards, predate the midnight agreement was not explained, but is likely the result of the fact that extended discussions took place through the evening of June 27 and into the morning of June 28. Exhibit M–14.

25. Exhibit R–13 at paragraph 7. There was no dispute that the significance of this agreement was to keep the factions represented by Allied on the one hand, and by Messrs. Bowers, Robichaud and Rodrigue, on the other, in equipoise. The post of chief executive officer was created by board resolution passed on July 2, 1990, as reflected in Exhibit M–17. Other changes consistent with the provisions of the "midnight agreement" were also enacted on that date.

26. The warrants were granted under paragraph 4(B) of the Third Amendment to the Investment Agreement, Exhibit R–5. Through the exercise, Allied would obtain 70% of the issued and outstanding capital stock of CAR, leaving 10% apiece in the hands of Messrs. Robichaud, Rodrigue and Bowers. The shares issued to Allied were placed in a voting trust and were to be voted in accordance with directions received from Allied. If no instructions were given, the trustee was to abstain from voting. As of July 24, 1990, Allied held and could vote 70% of the outstanding shares of CAR. Exhibit M–15. Allied's voting power within CAR is undisputed.

27. Exhibit R–13 at paragraph 10.

directors of CAR was convened in Allied's offices in Washington, D.C., at 10:00 a.m.[28] In the course of that meeting, which was not attended by Rodrigue, Robichaud and Bowers, the potential of filing bankruptcy petitions was discussed. Mr. Dyer asked for authority to file a petition in Chapter 11 bankruptcy and "all the members agreed." In addition, the "members unanimously approved authority" for Mr. Dyer to put CARM into Chapter 7 or 11 if he was unable to negotiate sale of CARM's assets to a third party. At a "continued" meeting the next day, bankruptcy for "the companies" was again discussed. However, formal board resolutions were not enacted at either session.[29] On July 24, however, Allied executed a document denominated "Shareholder Action Without Meeting—Consolidated Auto Recyclers, Inc.," which authorized Mr. Dyer to take the steps necessary to file a Chapter 11 petition for CARM.[30] Due to the deteriorating financial situation at CAR, Mr. Dyer also was authorized to file a Chapter 11 case on its behalf, and did so, with Allied's approval and authority on July 27, 1990.[31] Swenson was appointed trustee for CAR on August 9. Mr. Dyer did not file a petition for CARM.

Following his appointment, Trustee Swenson investigated the affairs of CAR and of CARM. He noted CAR's ownership of 100% of CARM's stock and found that, in important respects, the two entities' businesses had been conducted as one. The books and records of the two corporations did not completely segregate their

---

**28.** Exhibit M–16. The document memorializing the meeting is titled "Board Meeting Minutes for Consolidated Auto Recyclers of Massachusetts, Inc." and is dated July 23, 1990. However, that the minutes describe a meeting of the directors of CAR is clear. Although, after the June board expansions and elections, the CAR and CARM boards were identical, see n. 24 *supra*, what was commenced was a meeting of the board of CAR, consisting of three Allied directors, the three Principals, and CEO Dyer. *See* Exhibit R–13 at paragraphs 1 and 7. The gathering is described as a "regular meeting" and indicates that Messrs. Rodrigue, Robichaud and Bowers had informed Mr. Dyer, through their attorney, that they would not attend because the meeting was not convened at the proper hour. The dispute about the time for the "regular meeting" relates to the provision of the midnight agreement establishing weekly CAR board meetings. The CAR board minutes for July 2, 1990, Exhibit M–17, called for regular meetings at 9:00 a.m. each Monday morning at Allied offices.

The minutes of July 23 address a number of issues that relate to the business of CAR, rather than specifically to the business of CARM. The document closes with an entry to the effect that the meeting was "continued" to the next day, July 24, "to obtain a quorum...."

The minutes for July 24, Exhibit M–18, are similarly mislabeled. They reflect continuing discussions regarding bankruptcy filings for "the companies," *i.e.*, CAR and CARM.

**29.** Allied correctly points out that neither the July 23 or the July 24 minutes set forth a formal directors resolution authorizing initiation of bankruptcy proceedings for either entity. Specifically, they contain the following entries:

a. *July 23:*

4. Worchester [sic]/Linder Negotiation: The members unanimously approved authority for Mr. Dyer to put Consolidated Auto Recyclers of Massachusetts, Inc., into Chapter 7 or 11 if no satisfactory renegotiation of contracts with Mr. Linder, the seller, are obtained to sell it back to him.

   \*    \*    \*    \*    \*    \*

7. *Bankruptcy.* Mr. Dyer asked for authority to file a petition in Chapter 11 bankruptcy. All the members agreed.

b. *July 24:*

1. *Bankruptcy.* Mr. Dyer discussed the companies filing for Chapter 11 relief. He repeated that the Company is insolvent. Mr. Dyer proposes filing before the end of the week.

**30.** Exhibit M–15. The document, executed by each of the multiple Allied entities reads, in part:

By signature of the undersigned holders of seventy per-cent (70%) of the aggregate voting securities of the above corporation, pursuant to Article I, Section 10 of the bylaws of [CAR], it is hereby RESOLVED that Mr. Ralph A. Dyer is hereby authorized, in the name of this Corporation and on its behalf as sole shareholder of Consolidated Auto Recyclers of Massachusetts, Inc., to execute such shareholder actions, either with or without a meeting, as shall be reasonably necessary to authorize and cause the said Consolidated Auto Recyclers of Massachusetts, Inc., to petition for relief under Chapter 11 of the *U.S. Bankruptcy Code* (11 U.S.C.S. 1101 et seq.) and to further do all acts necessary to obtain the said relief.

**31.** The Chapter 11 petition for CAR was accompanied by a resolution of 70% of the shareholders of CAR (*i.e.* by Allied and its related entities) authorizing Mr. Dyer to effect the filing.

liabilities and there were unbooked asset transfers between the two corporation. He concluded, too, that CAR was a creditor of CARM,[32] and considered that the transaction by which Allied obtained a security interest in the assets of CARM may have constituted a voidable preference.[33] Trustee Swenson testified that he took steps to invoke bankruptcy protection for CARM in order to prevent Allied's foreclosure of its security interest in CARM's assets, to enable himself to ascertain what liabilities were attributable to CAR and which were attributable to CARM, to prevent movement of collateral between the entities which might have adverse effects on CAR, to attempt to retain the going concern value of CARM because he considered that he might be able to dispose of the assets of CAR and CARM together to an interested buyer, and to challenge Allied's potentially preferential acquisition of a security interest in CARM's assets.[34]

In order to effect the CARM filing, the trustee took a number of actions on August 21, 1990. At 4:30 p.m. on that day he executed a unanimous written consent of the stockholders of CARM on behalf of CAR, the sole shareholder. That consent included resolutions amending the by-laws of CARM, removing all of CARM's directors, fixing the number of directors at one, and electing Trustee Swenson as the sole director.[35] Thereafter, at 5:00 p.m. on August 21, Trustee Swenson executed a Unanimous Written Consent of Stockholders and Directors of CARM that removed all incumbent officers from office, elected Swenson as president, treasurer and secretary, and authorized filing a Chapter 11 petition for CARM.[36] Allied received no notice of these corporate actions before they were taken. The trustee neither sought nor obtained court approval for initiating changes in the internal structure of CARM or for filing the CARM petition.[37]

### Issues Presented

The issues presented by Allied's motion to dismiss fall into two general categories. The first relates to the power and authority of the trustee to carry out the corporate action required to initiate Chapter 11 proceedings for CARM in the context of the agreements, arrangements and relationships among CAR, CARM and Allied. For the most part, these issues will be resolved by referring to principles ordering the affairs of corporations, including state law and corporate by-laws, as modified or otherwise affected by the stock pledge and by the appointment of a trustee for CAR after its petition was filed. The second set of issues arises more directly under the Bankruptcy Code and requires that CAR's trustee's actions in filing a petition for the wholly-owned subsidiary be scrutinized in light of the general authority to operate a debtor's business granted by 11 U.S.C. §§ 363(c)(1), 1108, as limited by § 363(b)(1)'s provision for notice and hearing as a condition of the trustee's non-ordinary course use of estate property. Finally, should the court conclude that the steps taken by the trustee to initiate bankruptcy proceedings for CARM constituted the character action for which prior notice and hearing were required, the question wheth-

---

**32.** The trustee's initial review of corporate records indicated that CARM owed CAR approximately $2,092,000.00. The bankruptcy schedules of CARM, prepared by the trustee indicate that CAR was owed approximately $500,000.00 for unreimbursed inventory transfers and that it might be owed another $1,592,700.00 on account of payments made, or to be made, under a non-competition agreement benefiting CARM. *See* CARM Bankruptcy Schedules, Exhibit M–23.

**33.** Although the closing on the $500,000.00 loan took place on March 30, 1990, the financing statement reflecting Allied's security interest in all of CARM's assets was filed with the City Clerk for the City of Worcester, Massachusetts, on June 11, 1990. Exhibit R–9. *See* 11 U.S.C. § 547(b), (e), and Mass.Gen.Laws Ann. ch. 106 § 9–401(1)(c) (1990).

**34.** The trustee filed the preference action on December 5, 1990, Adv. No. 90–1056.

**35.** Exhibit M–25.

**36.** Unanimous Written Consent of Stockholders and Directors, Exhibit M–26.

**37.** The court's record is clear and, regarding notice, the testimony of Mr. Russell, Allied's representative with principal responsibilities for the CAR/CARM accounts, is uncontroverted.

er authority can and should be granted *nunc pro tunc* for those actions must be addressed.

In the course of hearings, the trustee stipulated that he would not rely on claims that Allied wrongfully caused continuing defaults under the senior secured notes by failing to advance additional sums to CARM after June 28, 1990, in defense of the motion to dismiss.[38]

### Conclusions of Law

#### 1. Standing Issues.

■ At the threshold, the trustee asserts that, as a creditor of CARM, Allied lacks standing to challenge the trustee's corporate authority to file CARM's bankruptcy petition. He posits that Allied's only relationship to CARM was that of a creditor, asserting that creditor status ineluctably leads to the conclusion that Allied cannot seek dismissal here.

In support of his argument, the trustee cites *In re Professional Success Seminars Int'l., Inc.*, 18 B.R. 75 (Bankr.S.D.Fla.1982) and *In re Jack Kardow Plumbing Co.*, 451 F.2d 123 (5th Cir.1971). *Professional Success Seminars* held that a creditor could not challenge the filing of a voluntary Chapter 7 petition on the ground that there was no corporate authorization for the bankruptcy filing. *Jack Kardow Plumbing*, in which the Fifth Circuit addressed the standing of a general creditor to oppose an involuntary adjudication in bankruptcy and applied § 18(b) Bankruptcy Act of 1938,[39] is not on point, aside from its advice that arguments interposed by creditors seeking to protect a preference or to retain some other advantage at the expense of others should not be indulged. 451 F.2d at 130.[40] *See also Royal Indemnity Co. v.*

*American Bond & Mortgage Co.*, 289 U.S. 165, 171, 53 S.Ct. 551, 554, 77 L.Ed. 1100 (1933) (creditor lacks standing to raise statutory requirements not intended for its protection); *In re Ann Arbor Machine Corp.*, 274 F. 24 (6th Cir.1921) (general creditor may not raise issues regarding regularity of directors' meeting authorizing bankruptcy). *Cf. In re Guanacevi Tunnel Co.*, 201 F. 316 (2nd Cir.1912) (examining creditors' challenge based on corporate authority issues but expressing doubt regarding standing).

The rule, as invoked by the trustee, is too broadly phrased. Creditor challenges to bankruptcy filings have been entertained on a number of grounds. *See In re Community Book Co.*, 10 F.2d 616 (D.Minn. 1926) (creditor challenge to filing upheld, even though dismissal benefitted petitioning creditor); *In re A–K Enterprises, Inc.*, 111 B.R. 149 (Bankr.N.D.Ohio 1990) (permitting challenge to multiple filings as abusive); *In re Giggles Restaurant, Inc.*, 103 B.R. 549 (Bankr.D.N.J.1989) (landlord had standing to challenge voluntary petition by raising issues of corporate authorization under state law of corporations); *In re Memphis–Friday's Associates*, 88 B.R. 821 (Bankr.W.D.Tenn.1988) (creditor may challenge filing on the basis that it was effected without consent of general partners); *In re A·T of Maine, Inc.*, 56 B.R. 55 (Bankr.D. Me.1985) (creditor objections to second Chapter 11 filing); *In re Verrazzano Towers, Inc.*, 10 B.R. 387, 391 (Bankr.E.D.N.Y. 1981) (creditor may raise jurisdictional challenge to bankruptcy filing). Indeed, 11 U.S.C. §§ 1112(b) and 1109(b) expressly permit parties-in-interest, including creditors, to seek dismissal of a Chapter 11 case.[41]

---

**38.** As a consequence, such evidence as was put forward relating to the existence or non-existence of a commitment from Allied to advance additional funds under the terms of the midnight agreement, and the role of Mr. Dyer in Allied's decision not to advance additional funds, will be disregarded.

**39.** 11 U.S.C. § 41(b) replaced by 11 U.S.C. § 303(d) of the Bankruptcy Reform Act of 1978.

**40.** Who may answer and contest an involuntary petition in bankruptcy is now addressed by 11 U.S.C. § 303(d) and B.R. 1011(a).

**41.** Section 1112(b) lists a number of grounds upon which a motion to dismiss or convert a Chapter 11 proceeding may be based. None of them addresses issues of corporate authority. However, the statutory language establishes that the list is non-exclusive. *See In re Alves Photo Service, Inc.*, 6 B.R. 690, 694 (Bankr.D.Mass. 1980).

■ In passing upon a challenge to a creditor's standing to seek dismissal, the court should consider whether the party raising the challenge has a stake in the case sufficient to entitle it to be heard, taking into account the policies underlying the principles it invokes and the scope of protections intended to be afforded by those policies. *In re Giggles Restaurant, supra.*

Allied is a creditor of CAR and CARM, as well as a majority shareholder of CAR. Allied bases it challenge in part on the trustee's authority and actions in the context of the CAR bankruptcy. In addition, Allied's relationship to both CAR and CARM, including its rights under the CARM Stock Pledge Agreement, place it in a far different position than a general creditor of the estate who is otherwise a stranger to the debtor entities. The character of Allied's challenge is more complex than a claim that the bankruptcy filing was not authorized by the debtor under corporate law principles. Its relationship to both CAR and CARM is sufficiently distinct from that of a mere general creditor. It should, and does, have standing to pursue its motion to dismiss.

2. *Corporate Authority and the CARM Filing.*

■ Allied argues that the trustee's actions in filing the CARM petition were without corporate authority.[42] In support of its contention, allied points to the CARM stock pledge agreement, executed by both the parent and the subsidiary and to the uncontroverted fact that, prior to August 21, CARM had not made payments under the senior secured notes. More particularly, Allied contends that CARM was in default of its obligations under the notes and,

therefore, that Allied, rather than CAR had the right to vote CARM shares. As a result, it considers that governing control of CARM lay with it, rather than with CAR, on August 21, when the trustee acted. In response, the trustee asserts that the midnight agreement of June 28 waived CARM's defaults and contests the asserted legal significance of the stock pledge agreement in light of the ongoing relations among Allied, CAR and CARM.

On this point, the trustee prevails. Assuming that CARM's defaults persisted through August 21, the stock pledge agreement leaves unanswered the question of who had the right to vote CARM stock after a default. The pledge simply states that "if no default has occurred," the stock holders (i.e. CAR) retain the right to vote the CARM stock. It does not expressly dictate what is to happen to voting rights upon default and does not set forth any mechanism for transferring voting rights to Allied or some other entity.[43]

The pledge's ambiguous language, coupled with Allied's conduct, demonstrates that Allied did not have that the right to vote CARM stock shifted to it automatically when CARM failed to make payments under the notes. The stock pledge agreement contains only a negative implication that CARM's default would obviate CAR's right to vote CARM stock. Paragraph 4 of the pledge provides that in the event of default Allied will have the rights and remedies provided in the Uniform Commercial Code of the District of Columbia, relating to foreclosure and sale. CAR remained at all times CARM's only shareholder of record.[44] Significantly, the portion of the pledge immediately following language addressing CAR's continuing right to vote the stock absent default goes on to say that,

---

42. Because both CAR and CARM are Delaware corporations, Delaware law controls issues of their corporate governance. *Restatement (Second) of Conflict of Laws* § 302 (1971).

43. *See* CARM Stock Pledge Agreement, *supra,* text at n. 21.

44. The District of Columbia's U.C.C., made applicable by the pledge's terms, does not provide that, upon default, a pledgee immediately ob-

tains voting rights in pledged stock. *See* D.C. Code Ann. § 28:9–504 (1981). Neither does the Delaware Corporations Code provide for such an automatic transfer of voting rights. Indeed, under Delaware law, the shareholder of record is entitled to vote the stock. *See* De.Code Ann. tit. 8 § 217(a) (1990). The CARM stock ledger shows CAR as the registered owner of CARM's stock. *See also In re Hickory Point Industries, Inc.,* 50 B.R. 303 (Bankr.M.D.Fla.1985) and Exhibit M–19.

under undefined circumstances, the "secured party" or "any purchaser at any foreclosure sale" shall execute proxies in favor of the "undersigned" upon request.[45] The "undersigneds" on the pledge are CAR and CARM only.[46] Thus, the pledge agreement itself indicates that Allied or third parties would be required to execute proxies in favor of CAR to vote the CARM stock up to some point, perhaps as late as a point after the sale of the shares at foreclosure. In addition, the June 19 letter described as Allied's foreclosure notice states that a sale of the stock "will divest" CAR of all of its rights as a shareholder.[47] The letter does not purport contemporaneously to divest CAR of any rights in the stock, including the right to vote it.

In addition, Allied's actions of July 24, 1990, indicate that it continued to consider that CAR was the entity with the continuing right to vote the shares of CARM. On that date it executed a document entitled "Shareholder Action Without Meeting for Consolidated Auto Recyclers, Inc.," in which it authorized Mr. Dyer "in the name of this Corporation (CAR) and on its behalf as sole shareholder of Consolidated Auto Recyclers of Massachusetts, Inc.," to initiate Chapter 11 proceedings for CARM. Thus, Allied did not consider that CAR had been divested of rights as CARM's shareholder automatically by virtue of CARM's defaults and the pledge. Thus, the evidence establishes that CAR continued to have the right to govern CARM as its sole shareholder on August 21, 1990, when CAR's trustee took action to initiate CARM's bankruptcy filing. Even if the pledge could have operated to give Allied the right to vote CARM's shares upon CARM's default, Allied chose not to exercise that right.

Given CAR's continuing control of CARM, and the trustee's subsequent actions as the individual with decision making capacity for CAR,[48] the filing was authorized under attendant principles of corporate governance.[49]

---

**45.** CARM Stock Pledge Agreement, *supra,* text at n. 21.

**46.** CARM Stock Pledge Agreement, Exhibit R–7, page 2. Allied, through Allied Investment Corporation and Allied Investment Corporation II has executed a separate, third page of the agreement, denominated simply "receipt", under which it acknowledges receipt of the pledged securities and agrees to the terms and conditions of the pledge agreement.

**47.** Allied's letter of June 19, 1990, *supra,* text at n. 20.

**48.** The trustee removed Mr. Dyer as CEO on August 14, 1990, and thereafter executed those duties himself.

**49.** The trustee also argues that, because Allied itself executed a shareholder resolution on July 24, 1990, authorizing Mr. Dyer to file a Chapter 11 petition for CARM, Allied consented to the CARM filing and, therefore, cannot complain. *See* Exhibit M–15, quoted *supra* at n. 30. In the course of his continuing testimony, on redirect examination, Mr. Russell explained that the authorization for Mr. Dyer to file a bankruptcy petition for CARM was only given as a negotiating tool to assist him in attempting to finalize a sale of CARM's assets back to the party from which they had been acquired. *See* quoted passage from minutes of July 23 at n. 29, *supra.* In his testimony, Mr. Dyer reiterated that contention and claimed that he had merely wanted to represent to the potential purchaser that he was authorized to file if a deal could not be reached. However, this testimony cannot be credited. Mr. Russell first described the grant of authority to initiate bankruptcy for CARM in his October 4 testimony. His subsequent explanation and qualification, as well as that of Mr. Dyer, came in after weeks of reflection, on December 17, 1990. Moreover, if the sole purpose of a threatened CARM bankruptcy was to provide Mr. Dyer with negotiating leverage, it is difficult to understand why Allied went to the extra step of passing a shareholder resolution on July 24. That action provided Mr. Dyer with the authority to file in his discretion. Given the conclusion that the trustee acted with authority as the executive officer of CAR, which continued to have the right to vote CARM's shares, it is unnecessary to discuss the issue of consent at length. However, the evidence does support the conclusion that Allied had consented to the filing of a bankruptcy petition for CARM on July 24, 1990, and that it never revoked that consent. The trustee correctly points out that, under Delaware's law of corporations, having given its consent as a CAR shareholder to the filing, Allied cannot now complain that the authority was utilized. *See Elster v. American Airlines, Inc.,* 100 A.2d 219 (Del.1953). One must conclude that, with the benefit of hindsight, Allied has perceived the threat to its security interest presented by the operation of the preference recovery rules of 11 U.S.C. § 547.

### 3. *The Nunc Pro Tunc Motion.*

Having concluded that the CARM bankruptcy filing was an authorized corporate act, the question remains whether the trustee was required to obtain prior authority for this court for the actions he took and, if so, whether lack of such authority dictates dismissal. Allied, the only creditor to challenge the CARM filing, contends that Trustee Swenson's failure to seek authority by motion under 11 U.S.C. § 363(b)(1) or § 105 prior to voting CAR's shares of CARM to initiate the CARM bankruptcy is fatal. Further, it argues that *nunc pro tunc* approval of the filing would be inappropriate on this record. Trustee Swenson explained his reasons for filing the CARM petition, including his belief that Allied was about to foreclose on CARM's assets, that Allied's lien was preferential, that he needed to preserve the going concern value of CARM in order to effect an advantageous sale of CAR's assets and that the filing would serve to maximize the value of the CARM stock and to increase the chances that CAR would receive value on account of the obligations owed to it by CARM.

### a. Need for Authority Under § 363(b)(1).

Before considering arguments regarding the grounds upon which this court might have granted, or might still grant authority for CAR's trustee to initiate CARM's bankruptcy filing, the question whether pre-filing authority was required must be addressed. The language of the Bankruptcy Code, and the few pertinent reported decisions, clearly establish that it was.

■ The Code sets forth the duties of the trustee in some detail. 11 U.S.C. § 1106. The trustee is authorized to operate the debtor's business, 11 U.S.C. § 1108. So long as a trustee conducts the affairs of the estate by exercising his business judgment in good faith, upon a reasonable basis, and within the scope of his authority under the Code, he may proceed without interference. *See In re Curlew Valley Assoc.,* 14 B.R. 506, 513–14 (Bankr.D.Utah 1981). *Cf. Bennett v. Williams,* 892 F.2d

822, 824 (9th Cir.1989) (deference to business management decisions of bankruptcy trustee).

■ The trustee's authority to operate the debtor's business and to administer the affairs of the estate, however, is not unfettered. The Code clearly contemplates that, in addition to taking action in the "ordinary course" of business, the trustee may be called upon to consider undertaking action that is not in the ordinary course. On such occasions, notice and a hearing are required. 11 U.S.C. § 363(b)(1). *See, e.g., In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 984 (Bankr.N.D.N.Y.1988) ("[T]hose extraordinary transactions are required to be brought to the attention of all parties-in-interest to allow them to articulate any objections ...").

■ The trustee asserts that it was unnecessary to seek approval by motion before voting CARM's stock to authorize filing a Chapter 11 petition. While acknowledging that the CARM shares were property of CAR's estate,[50] he contends that voting them as he did does not constitute "use, sale or lease" of them. Rather, he claims that voting the stock was merely exercising an "incident of ownership." The court cannot agree. "Use" denotes the act of using, and the exercise of voting rights is one of the uses to which the CARM stock could be put. If a shareholder were enjoined from "using" his shares, one would expect the injunction to comprehend attempts to vote them. Voting the shares was "use" of them for purposes of § 363.

CAR's trustee cannot seriously contend that using the CARM stock to amend CARM's by-laws, to remove its board of directors, to reduce the board's size to one, to elect himself sole director, to remove corporate officers, to replace the removed officers with himself, and to authorize the filing of bankruptcy, was in the "ordinary course of business." Rather, he would have the court focus on his contention that, at the time he took those actions, he considered that they were essential to preserving the value of the CARM stock, an asset

---

**50.** 11 U.S.C. § 541(a).

of CAR, and that they served the Bankruptcy Code's policies. Ascertaining whether the use to which the stock was put was within or without the ordinary course of CAR's business is, however, a measure of the action taken, not of the justification for taking it. *See In re C.E.N., Inc.*, 86 B.R. 303, 305 (Bankr.D.Me.1988). Using the shares to initiate bankruptcy for CARM must be viewed as a departure from CAR's general pre-petition business practices and, most certainly, outside the scope of CAR's day-to-day operations. *Id.*[51]

Thus, voting the shares of CARM held by CAR to bring about CARM's bankruptcy filing was a use of property of CAR's estate, other than in the ordinary course of business, for which authority should have been sought by motion.[52]

### b. Retroactive Authority.

Having gone forward without prior approval, the trustee was met with Allied's motion to dismiss immediately after the case was filed. As noted above, the trustee, without acknowledging its necessity, sought *nunc pro tunc* approval by motion dated December 19, 1990.[53]

This court has discretionary authority under 11 U.S.C. § 105 to enter an order *nunc pro tunc* under appropriate circumstances. *See In re Certain Special Counsel to Boston & Maine Corp.*, 737 F.2d 115 (1st Cir.1984); *In re Cormier*, 35 B.R. 424, 425 (D.Me.1983); *In re Alafia Land Development Corp.*, 40 B.R. 1 (Bankr.M.D.Fla. 1984).[54]

In cases involving requests for *nunc pro tunc* approval of transactions that might benefit insiders, or that would short-circuit the Bankruptcy Code's procedures for plan approval and confirmation, careful scrutiny is required; the request should not be lightly granted. *See In re City Wide Press, Inc.*, 110 B.R. 710, 711 (E.D.Pa.1990); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 982–84 (Bankr.N. D.N.Y.1988); *In re C.E.N., Inc.*, 86 B.R. 303 (Bankr.D.Me.1988).

It has been said that *nunc pro tunc* orders may be entered only under extraordinary circumstances, where they will not prejudice any party or frustrate the purposes of the Bankruptcy Code. *In re Auto–Train Corp.*, 810 F.2d 270, 275 (D.C. Cir.1987); *In re Triangle Chemicals, Inc., supra,* 697 F.2d at 1286. When entering an order retroactively will further the purposes of the Bankruptcy Code without unfairly prejudging parties-in-interest, *nunc*

**51.** *See Also In re Johns–Manville Corp.*, 60 B.R. 612 (Bankr.S.D.N.Y.1986). Although CAR's shareholders did authorize a filing for the subsidiary on July 24, Exhibit M–15, that, too, was an extraordinary event. One is hard-pressed to imagine an event or transaction more clearly extraordinary than authorizing a bankruptcy filing.

**52.** 11 U.S.C. § 363(b)(1), B.R. 6004(a).

**53.** That the trustee waited nearly four months before filing the *nunc pro tunc* motion might be considered relevant. However, Allied's motion, initiated immediately after the filing, put the trustee's authority under the Code at issue early in the case. In the course of hearings on October 4, 1990, Allied's counsel articulated the two basic premises underlying his client's motion: that the trustee's action was in derogation of the rights of CARM's corporate constituents, and that it was taken without authority under the Bankruptcy Code. Transcript of October 4, 1990 at p. 46. The trustee met those arguments head-on, and Allied cannot be surprised that he sought to shake up his defense with the *nunc pro tunc* request. The motion of December 19 can be seen as, in essence, the formal exposition of an alternative defense to the dismissal motion. The pertinent issues were tried by consent. *Cf.* Fed.R.Civ.P. 15(b).

**54.** In bankruptcy cases, requests for entry of orders *nunc pro tunc* is most commonly encountered in connection with applications seeking authorization to retain professional persons to render services for the estate. *See, e.g., In re Certain Special Counsel to Boston & Maine Corp., supra; In re Triangle Chemicals, Inc.*, 697 F.2d 1280 (5th Cir.1983); *In re Cormier, supra; In re Eastern Inns of New Hampshire, Inc.*, 72 B.R. 418 (Bankr.D.Me.1987); *In re Thibodeau*, 20 B.R. 107 (Bankr.D.Me.1982). Such requests are dealt with carefully because it is essential that the court maintain control over the practice of professionals before it, *In re Eastern Inns of New Hampshire, Inc., supra* at 420, because dollars expended on administrative expenses will not be available for creditors, *In re Thibodeau, supra,* and, not insignificantly, because the Bankruptcy Code itself expressly requires that professionals be retained only upon application and court authority. 11 U.S.C. §§ 327, 1103; Bankruptcy Rule 2014.

*pro tunc* effect may, and should, be provided. For example, an order for substantive consolidation can be made *nunc pro tunc* to the date of the original bankruptcy filing, exposing a pre-petition transfer to potential avoidance under preference or fraudulent conveyance analysis, thereby promoting the policy of equal distribution among similarly situated creditors. *See In re Kroh Bros. Development Co.*, 117 B.R. 499, 502 (W.D.Mo.1989). Within the unique factual context of this case, a rigid insistence that the trustee demonstrate "extraordinary circumstances" is unwarranted.

■ In this case, it is beyond question that the trustee acted in a manner consistent with his fiduciary duty to preserve the assets of the estate and, to the extent possible, to maximize their value. *Cf. Mosser v. Darrow*, 341 U.S. 267, 274, 71 S.Ct. 680, 683, 95 L.Ed. 927 (1951) (trustee liability for breach); *In re San Juan Hotel Corp.*, 847 F.2d 931, 936–937 (1st Cir.1988) (same).

The trustee's actions in initiating Chapter 11 proceedings for CARM preserved the opportunity to challenge the Allied security interest as a preference, a prospect that greatly enhances CAR's prospects as a creditor of CARM and, therefore, stands to benefit the estate. His conduct affirma-

tively furthered Bankruptcy Code policies.[55] Allied was not prejudiced by the trustee's actions, other than to the extent that his early filing of the CARM petition may have preserved the preference cause of action.[56] Allied learned of the filing at once, and was able to bring forward its motion to dismiss on the very heels of the petition. Its ability to present its arguments was not meaningfully inhibited by the trustee's failure to obtain advance authority for his action.[57]

The one factor that gives the court pause in passing on the propriety of entering the order *nunc pro tunc* is the issue of the trustee's good faith in effecting the CARM filing without first seeking authority to do so.[58] As is evidenced by the ingenuity with which the trustee manipulated corporate procedures to place himself in a position to file the petition, he was represented by competent counsel from the very beginning of the case. Together, the trustee and counsel should have recognized their gambit as something other than business in the ordinary course and should have requested a hearing pursuant to 11 U.S.C. § 363(b)(1). The court cannot condone their action but, at the same time, it will not refuse *nunc pro tunc* effect to the order on that ground alone in light of the totality of circumstances, including the very real benefits

55. In this respect, the trustee's request for *nunc pro tunc* authority is vastly different from those cases in which the subject action directs the debtor of assets that could serve as the "cornerstone for a sound plan," *In re Lionel Corp.*, 722 F.2d 1063, 1066 (2nd Cir.1983); supersedes the plan confirmation process, *In re Copy Crafters Quickprint, Inc., supra;* or benefits insiders at the estate's expense, *In re C.E.N., supra.*

56. The trustee has argued that the potential expiration of the ninety-day preference period for the Allied security interest, discussion *supra* at n. 15, necessitated the CARM filing and excused altogether the need for a hearing under 11 U.S.C. §§ 363(b)(1) and 102(1) (defining "after notice and hearing"). Today's result makes resolution of that issue, which might require further evidentiary hearings, unnecessary. The court expresses no opinion today as to whether Allied received a preferential transfer or whether the ninety-day preference period is applicable to Allied. *See* 11 U.S.C. §§ 101(30)(B)(iii), 547(b)(4).

57. Although the final evidentiary hearing on the motion was not conducted until December 17, 1990, the parties were informed that hearing dates were available well in advance of that time. Although conduct of the case was far from dilatory, any delay in presenting and closing the evidence of which Allied might complain is as attributable to its own conduct as it is to the conduct of any other party.

58. The trustee might have proceeded by another avenue, such as attempting to initiate an involuntary filing against CARM, 11 U.S.C. § 303, or by seeking substantive consolidation. *In re Kroh Bros. Development Co., supra.* Either initiative may have proven effective and would have precipitated in early hearing. These possibilities, which do not lend support to a finding that extraordinary circumstances existed, would, therefore, have provided Allied with nothing more than it got, a hearing on its objections to CARM's bankruptcy.

that may accrue to CAR's estate.[59]

The legal effect of the stock pledge and of Allied's conduct both before and after June 28, 1990, would have convinced the court that the trustee had the power to file the petition for CARM had that determination been made sooner, rather than later. The record firmly convinces the court that, had proper procedures been followed, authority would have been granted. *In re C.E.N., Inc., supra*, 86 B.R. at 306.

Allied argues that a *nunc pro tunc* authorization should nevertheless be denied for several additional reasons. It urges that, because the trustee stands to benefit through increased commissions if additional, free assets are found, he is an "insider" [60] or has a conflict of interest by which he should not benefit. In addition, Allied argues that it has had inadequate opportunity to cross-examine the trustee regarding the basis for the beliefs on which he acted at the time of the CARM filing. Given the chance, it claims that it can demonstrate that his beliefs were mistaken and that the filing has not, in the end, worked for the benefit of CAR's estate. These contentions do not require lengthy treatment. As noted above, at the first evidentiary hearing the question of the trustee's authority under the Code was raised. The trustee testified regarding his reasons for filing the CARM petition. Allied had ample opportunity to cross-examine. In addition, the question whether authority would have been granted had application been timely made must be answered by focusing on the facts and circumstances as they existed on the date that the CARM petition was filed, rather than through the lens of hindsight, informed by subsequent developments. Furthermore, this court's review of the facts lead it to conclude that the trustee's ongoing performance of his duties and, more specifically, his decision to file the CARM bankruptcy, was not the product of interests materially adverse to his statutory role. *Cf. In re Martin*, 817 F.2d 175,

182 (1st Cir.1987) (discussing evaluation of alleged conflict of interest of debtor's counsel). That any trustee will benefit monetarily by receiving additional compensation when unencumbered assets are found and distributed is obvious. 11 U.S.C. § 326. Such is the very structure of the Bankruptcy Code. Given the trustee's qualification and appointment pursuant to 11 U.S.C. §§ 322 and 1104, the fact that he stands to gain some additional measure of compensation does not taint his efforts to enlarge the estate.

### Conclusion

For the reasons set forth herein, separate orders denying Allied's motion to dismiss and granting the trustee authority to initiate the CARM bankruptcy filing, *nunc pro tunc* to August 21, 1990, will be filed with the clerk forthwith.

---

**59.** Among other circumstances taken into account is the fact that the only party opposing the trustee is Allied, allegedly the recipient of a voidable preference from CARM. *Cf. In re Jack*

*Kardow Plumbing Co., supra* (discussing issues of creditor standing).

**60.** 11 U.S.C. § 101(30).