In re **FOUNDRY OF BARRINGTON PARTNERSHIP, an Illinois General Partnership, d/b/a The Foundry of Barrington, Debtor.**

**FOUNDRY OF BARRINGTON PARTNERSHIP, an Illinois General Partnership, d/b/a The Foundry of Barrington, Plaintiff,**

v.

**Jeffrey BARRETT, not individually, but as receiver for The Foundry of Barrington, Defendant.**

**Bankruptcy No. 91 B 07732.**
**Adv. No. 91 A 00380.**

United States Bankruptcy Court, N.D. Illinois, E.D.

July 24, 1991.

Philip V. Martino, Rudnick & Wolfe, Chicago, Ill., for Prudential Ins.

Arthur Simon, Richard D. Grossman, Dannen, Crane, Heyman & Simon, Chicago, Ill., for debtor.

Jeffrey Barrett, pro se.

Denyse H. Heffner, U.S. Trustee, Dept. of Justice, Chicago, Ill., for Dept. of Justice.

## MEMORANDUM OPINION

RONALD S. BARLIANT, Bankruptcy Judge.

The Debtor owns a half-empty shopping center encumbered by a mortgage held by Prudential Insurance Company of America. After Prudential obtained the appointment of a receiver in a state-court foreclosure action, the Debtor filed this chapter 11 case. Now Prudential wants this Court to abstain or to dismiss the case; to excuse the receiver from surrendering possession of certain property to the Debtor; and to prohibit the Debtor from using cash collateral. The Debtor has countered with a request to use cash collateral and, in an adversary proceeding, to require the receiver to turnover the rent proceeds he holds.

Prudential's motion to excuse the receiver from his obligation to turn over property will be granted, and the receiver will be allowed to take full control of the property. All other motions will be denied and judgment will be entered against the Debtor in the adversary proceeding.

## I. FINDINGS OF FACTS

The Debtor is a general partnership consisting of three partners, James F. Avgeris, Melvin Helms, and Gerald Kostelny. The Debtor is the sole beneficiary of an Illinois land trust that owns an 80,000 square foot shopping center in Barrington, Illinois, "The Foundry of Barrington". The Foundry is managed by Dearborn Associates, Inc., and its rental agent is Lincoln Property Company. The general partners in the Debtor are principals of Dearborn and Lincoln.

The Debtor acquired the Foundry shopping center in May, 1989 for $7.9 million. The purchase was financed by a bank loan and $2.5 million in other funds that represented the proceeds of a personal loan to Mr. Avgeris. The partners made no other contributions to the Debtor except a $250.00 capital contribution by each partner at the time of the Debtor's formation.

When the Debtor acquired the shopping center it was only 60% occupied. Other tenants were obtained and the shopping center became 100% occupied during the next several months. The primary, or anchor, tenant was Barrington Market.

The three partners in the Debtor and Gerald Bockwinkle owned the stock in the Market. (Mr. Bockwinkle was also an original partner in the Debtor, but he was not a partner at the time of the filing of this case.) In early 1990, the Market was experiencing financial problems and needed fresh capital. The partners and the Debtor agreed to infuse $700,000.00 into the Market. The form of that contribution, however, consisted in part of a credit for rent due the Debtor beginning with March, 1990 of up to $300,000.00 and forgiveness of rent that was past due as of February 28, 1990. The partners and Mr. Bockwinkle agreed to the essential terms of this arrangement before the Debtor's loan from Prudential closed, but the written agreement was not signed until thereafter.

In fact, the Market never paid any rent in cash, but only by means of the credit

given to it by the Debtor. So, the Market never contributed to the cash flow of the Foundry shopping center.

The Debtor borrowed $8.4 million from Prudential in May, 1990. Under the terms of the note, interest in the amount of $66,000.00 was payable each month until May 19, 1993, when the principal became due. The loan was non-recourse, so that the partners had no personal liability for it, and it was secured by a mortgage and an "absolute assignment of rent."

The Debtor never told Prudential, and Prudential did not learn before the loan closing, about the agreement between the partners and Mr. Bockwinkle to forgive and allow credits for the Market's rent, or that the Market had never paid cash rent. To the contrary, during the course of negotiating the loan, the Debtor provided Prudential with a rent roll showing about $25,000.00 in rent from the Market as a part of $86,000.00 monthly total rent. The Debtor also provided copies of the shopping center leases and represented that there were no breaches of those leases. The Debtor and all three of its partners represented that, "All of said leases have tenants in occupancy who are paying rent as aforesaid, except as noted in the Rent Roll." Owner's Affidavit, dated May 14, 1990, item 18 in Exhibit A. Neither anything "aforesaid" nor the Rent Roll disclosed the agreement to forgive and give credits for rent owed by the Market or the Market's non-payment of rent.

Prudential did know, however, that the Market had been experiencing financial difficulties. Prudential investigated the Market's financial condition and regarded third party partial guarantees of the lease as mitigating the risk of default by the Market.

The Prudential loan resulted in substantial benefits to the general partners. Of the $8.4 million in proceeds the Debtor received at the closing of the Prudential loan, $6.6 million was used to pay off the bank loan (which was a recourse loan) that financed the acquisition, and the balance was paid to the Debtor. The Debtor then used $1,150,000 of those funds to reduce the balance of the loan Mr. Avgeris had taken. The net result was that the partners eliminated a $6.6 million personal obligation, and Mr. Avgeris substantially reduced his personal debt with the proceeds of the non-recourse Prudential loan. The Debtor and its assets, however, became burdened with substantially more secured debt than existed before the transaction.

The Debtor, using the remaining proceeds of the loan, paid interest to Prudential for six months, but has made no payments since December, 1990. Also in December, 1990, the Market gave up the ghost, and closed. Without any cash flow from the space occupied by the Market, and having exhausted the capital derived from the Prudential loan, the Debtor was, and remains, unable to meet its payment obligations to Prudential. The Debtor also failed to make real estate tax payments for 1990. The Debtor did, however, manage to pay interest on Mr. Avgeris' loan after it stopped paying Prudential.

Prudential filed a mortgage foreclosure action in Lake County, Illinois in March, 1991, and the court appointed Mr. Jeffrey Barrett as a receiver on March 27, 1991. The Debtor filed this chapter 11 case on April 11, 1991.

Before this case was filed, Mr. Barrett collected some rent and attempted to obtain documents and otherwise take effective control of the property. Mr. Barrett never did obtain the relevant documents and the issue of control was in some state of confusion at the time of filing. Since the filing, of course, the receiver and Prudential have ceased efforts to obtain control of the Debtor's property.

The value of a shopping center depends primarily on its income stream. The shopping center is now about 50% occupied. At that level of occupancy, the value of the shopping center is $6 million. The amount of Prudential's claim exceeds that value by about $3 million. At full occupancy, however, the center's value would exceed the amount of the debt owed Prudential. Mr. Helms estimated the value at full occupancy to be about $12 million. In May, 1990, Prudential relied on an appraisal that put

the value of the shopping center with 95% occupancy at $10,750,000.00.

The Debtor has continued efforts to find new tenants. The Debtor has one signed lease, to which Prudential has not yet consented, as it must under the loan documents. The Debtor's representative is in active negotiations with other prospective tenants, including potential occupants for the space vacated by the Market. The Debtor's own projection is that the shopping center will be fully occupied by November, 1991. Under the terms of the leases under discussion, however, and in accordance with business practices not uncommon in the industry, rent flow will not begin under any new leases until several months thereafter. In addition, tenant improvements will be necessary.

At its current state of occupancy, the shopping center earns operating income sufficient to pay its operating expenses and taxes. During 1990 and early 1991, even without the Market rent, the Debtor had a positive cash flow before debt service. The Debtor projects that its positive cash flow (assuming no debt payments) will continue and its projections provide for an adequate escrow for real estate taxes. Under the circumstances, these projections are reasonable.

When the Debtor originally filed this case, it listed 15 creditors, other than Prudential, with routine trade claims totaling about $17,500.00. The Debtor has amended its filings and now claims 39 creditors, including Prudential; the Lake County Collector for real estate taxes in the amount of $108,217.00; tenants with security deposits of over $45,000.00; the original trade creditors with claims of about $17,500.00; and Mr. Avgeris, with a listed claim of $1,350,-000.00, representing the balance remaining on the $2.5 million he had borrowed to invest in the project at the time of the acquisition of the Foundry. The Debtor and Mr. Avgeris claim this investment as a debt, which is evidenced by a note, rather than an equity contribution, although, in April, 1990, the Debtor represented to Prudential that, "The general partners have also injected $2.5 million in equity into the project."

The assets claimed by the Debtor are the shopping center and its related leases and claims on leases, some equipment of small value, the funds held by the receiver, and a claim against the guarantors of the Market lease for about $420,000.00. (That claim is asserted in a separate adversary pending before this Court.)

The Debtor has outlined the plan of reorganization it intends to propose in this case. The shopping center would be operated by Dearborn and Lincoln would continue to seek tenants. The Debtor would pay interest on Prudential's claim after confirmation of the plan, but the maturity of the note would be extended until May, 1996, representing a three year extension.

All creditors, including Prudential, would be paid 100% of their claims by the sale of refinancing of the shopping center in or before 1996. The partners would make no capital contributions except as necessary to make up cash flow deficiencies, including deficiencies in payments to Prudential.

## II. MOTIONS AND PROCEEDINGS PENDING BEFORE THIS COURT.

Prudential has moved this Court to abstain from or dismiss this case under 11 U.S.C. § 305 on the grounds that this is really a dispute between a mortgagor and a mortgagee that can be promptly and properly resolved in State court. Prudential has also moved to dismiss this case under section 1112(b) on the ground that it was filed in bad faith. Further, Prudential seeks to excuse the receiver from turning over funds he's collected pre-petition and to prohibit the use of cash collateral, consisting of future collections of rent.

The Debtor has, in its own set of motions, moved for authority to use cash collateral to pay operating expenses, insurance, certain capital improvements, and real estate tax escrows. The Debtor alleges it cannot get credit elsewhere and offers adequate protection consisting of a lien in assets acquired post-petition, including subsequent rents, maintenance of insurance, and financial reporting to Prudential.

The Debtor has also filed an adversary complaint for the turnover of the funds held by the receiver and an accounting. This Court allowed Prudential to intervene as a defendant in that adversary proceeding and relieved the receiver from any obligation to answer or appear individually.

All the matters before this Court are core proceedings.

## III. CONCLUSIONS OF LAW

### A. *Prudential's Section 305 Motion*

■ Section 305(a) of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.,* authorizes dismissal or suspension of proceedings only in the interest of *both* the creditors and the Debtor. In this case, such relief would be in the interest of Prudential, but contrary to the interest of the Debtor and not in the interest of the other creditors of the Debtor (however many and whoever they may be). The Debtor would lose its interest in the property through foreclosure and any right or ability to protect that interest under the bankruptcy laws would also be lost. Other than the taxing authority, which presumably has a lien prior to Prudential's, other creditors of the Debtor would have no remedy in the foreclosure proceedings.

Prudential's Motion to Abstain or Dismiss under Section 305 will therefore be denied.

### B. *Prudential's Motion to Dismiss*

Prudential requests that this case be dismissed because it was filed in bad faith. District Court Judge Milton Shadur and Bankruptcy Judge Eugene Wedoff have shown that, although bad faith filing is often cited as a "cause" for dismissal under 11 U.S.C. § 1112(b), generally such cases are really dismissed for specific reasons that make chapter 11 relief inappropriate under the circumstances, and usually those reasons constitute one of the specific causes identified in section 1112(b). *In re Mandalay Shores Co-Op. Housing Ass'n, Inc.,* 63 B.R. 842 (N.D.Ill.1986); *In re N.R. Guaranteed Retirement, Inc.,* 112 B.R.

263 (Bankr.N.D.Ill.1990), *aff'd,* 119 B.R. 149 (N.D.Ill.1990).

As Judge Shadur said, 63 B.R. at 848:

Most of Chapter 11 deals with the mechanics of a reorganization, assuming that form of relief is appropriate. Section 1112(b) and its associated "good faith" doctrine are primarily concerned with the underlying question whether reorganization is the proper course of action in a particular debtor's case. On that score dismissal of a Chapter 11 petition—like dismissal of any lawsuit—is not imposed principally as a sanction for bad intentions or obstreperous behavior. Instead, dismissal flows from the legal determination the debtor is not entitled to the remedy it seeks.

Referring to factors often considered in bad faith filing decisions, Judge Shadur points out that they overlap the causes expressly stated in section 1112(b) and, "They are relevant to a debtor's actual ability to benefit from reorganization...." *Id.*

Judge Wedoff's analysis leads to the similar conclusion that little if anything is added by the words "bad faith." Rather, "the courts have actually responded to several distinct grounds for relief, stemming from different concerns and reflected in differing factual circumstances." 112 B.R. at 272. In general, these concerns focus on the debtor's need for and ability to obtain chapter 11 relief, the impact on creditors' rights and the causes listed in section 1112(b).

■ In this case, Prudential asserts four sets of factors to support its motion to dismiss. The first three can be dealt with quickly. First, Prudential makes the usual "single asset" argument. The shopping center is the Debtor's only asset, that asset is fully encumbered, the Debtor has no employees (it runs the project through affiliated firms) and it has few non-insider unsecured creditors. Second, this case was filed in the midst of the foreclosure action. Prudential asserts that the timing of this filing evidences bad faith. Third factor is the Debtor's "egregious misconduct" in concealing from Prudential the fact that

the shopping center's major tenant never paid rent.

None of this indicates that the Debtor does not need or is not able to achieve the remedy it seeks—financial reorganization under chapter 11. The Supreme Court has recently held that an individual not engaged in any business is eligible for chapter 11 relief. *Toibb v. Radloff,* —— U.S. ——, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). Surely the owner of a shopping center is entitled to attempt to save its interest in that property and the income it generates and to satisfy its creditors through a plan. And the very purpose of the automatic stay is to delay creditors long enough to allow the debtor an opportunity to restructure itself and propose a plan. "The stay is a legitimate benefit that allows Debtors time to reorganize and some bargaining power in negotiating with creditors." *In Re Schlangen,* 91 B.R. 834, 838 (Bankr.N.D.Ill.1988).[1] In this case, the Debtor's hopes for rehabilitation depend upon finding new tenants. That would be impossible were it not for the automatic stay that prevented loss of the property through foreclosure. Thus, the stay in this case serves its legitimate purpose and does not unduly prejudice Prudential.

■ Moreover the way in which the Debtor incurred its debt to Prudential has nothing to do with its ability to make use of chapter 11. There may be other remedies for fraud; indeed, it appears that Prudential is suing the partners in another forum. And the Debtor's ability to obtain a discharge may be in doubt. See, 11 U.S.C. § 523(a)(2). But nothing in the bankruptcy laws limits chapter 11 relief to Debtors whose debts are innocently incurred.

Prudential also asserts, however, that the Debtor cannot reorganize. In the words of § 1112(b)(2), Prudential alleges an "inability to effectuate a plan." Its principal argument is, in essence, that as a factual matter no plan will be feasible. Regarding the Debtor's shopping center, Prudential asserts, it "simply will not be anything near full occupancy with paying tenants this year."

■ Prudential's skepticism is understandable. But the Debtor produced evidence that it is in active negotiations with several potential tenants. It has one signed lease. Its witnesses, experienced in commercial real estate, project full occupancy by November. Although needs for tenant improvements and rent concessions may delay the beginning of rent payments from new tenants, that in itself does not negate the possibility that the Debtor's plan will be feasible by December. At this stage of the case it is not possible to find that the Debtor will not be able to propose a feasible plan within a reasonable time.

■ But, Prudential further argues, the Debtor cannot reorganize because the rental income it needs to operate is not merely cash collateral, but is Prudential's property under the "absolute assignment of rents." That "absolute assignment" is subject to a license in favor of the Debtor to use the rent until there is a default under the note or mortgage. Further, the "absolute assignment" terminates when the debt is paid in full. So the "absolute assignment" is not so absolute after all.

A lien is a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). The assignment of rents gave Prudential an interest in the rents and underlying leases. That interest, however, exists only to assure payment of the debt

---

1. This Court decided *Schlangen* using traditional good faith analysis and consideration of "factors" rather than the more precise, and better, analyses set forth in *Mandalay Shores* and *N.R. Guaranteed.* But even *Schlangen* says, "The good faith standard is the bankruptcy court's mechanism for assuring that a Chapter 11 case at least has the potential to serve [the] purposes [of chapter 11]." 91 B.R. at 837. And dismissal was based on the finding that, "There is no likelihood that this case will result in the rehabilitation of the Debtor's business or the orderly liquidation of her remaining assets." *Id.* at 839. So, although *Schlangen* should have been dismissed for one or more of the causes expressly listed in section 1112(b) ("(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation" or "(2) inability to effectuate a plan"), the result is consistent with *Mandalay Shores* and *N.R. Guaranteed.*

and performance of the other obligations of the Debtor. That is clear because the assignment terminates once the debt is paid. Prudential can call this arrangement an "absolute assignment" or, more appropriately, "Mickey Mouse." It's still a lien, and the rent is still the Debtor's property, subject to that lien. Assuming the Debtor can overcome other hurdles (see 11 U.S.C. § 363(c)(2)), it may be able to use those funds to reorganize.

Prudential next asserts that as a matter of law, no plan can be confirmed. Prudential argues that it will have an unsecured claim, by operation of 11 U.S.C. § 506(a), of about $3 million (the approximate difference between its claim and the value of the collateral). This claim is so large in relation to other unsecured debt that Prudential's negative vote will guarantee that any class of unsecured creditors of which it is a member will reject the plan described by the Debtor. But a plan must be accepted by at least one impaired class of claims, not including insiders. 11 U.S.C. § 1129(a)(10). Since the secured class (Prudential) and the unsecured class (controlled by Prudential) will both be impaired and will both reject the plan, it will not be confirmable.

This argument fails because it is not yet clear that the Debtor will be forced to place Prudential's unsecured claim in the same class as other unsecured debt. Nothing in chapter 11 expressly requires the Debtor to put all unsecured claims in a single class. Therefore, the general rule is that "unsecured claims ... may be divided into separate classes if separate classification is reasonable." 5 Collier on Bankruptcy, ¶ 1122.-03[4] (15th Ed.1991). The Debtor will argue that Prudential's interests are so different from those of other creditors that separate classification is reasonable. Maybe or maybe not. But this issue is not sufficiently developed in this record. Indeed, Prudential has not addressed it at all, although it has the burden of proving grounds for dismissal.

Prudential does, however, alternatively argue that even if there is an impaired class that accepts the plan, it will

still fail because it will violate the absolute priority rule. That rule, codified in section 1129(b)(2)(B)(ii), comes into play when the Debtor must use the cram-down powers of section 1129(b) to confirm a plan over the objection of a dissenting class. The rule essentially prohibits any class junior to a dissenting class of unsecured creditors from receiving or retaining anything under the plan. See, *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988). In this case, if the rule were applicable, the Debtor would be prohibited from keeping its interest in the property, which, of course, is its purpose for being here.

The problem with this argument is that the Debtor will probably not have to resort to the absolute priority provision of subpart (ii) of section 1129(b)(2)(B). There is an alternative means of cram-down in subpart (i). The Debtor may be able to confirm its plan if it pays each member of the dissenting class amounts that over time have the present value of the member's claim. Here, the Debtor proposes to pay all creditors in full. If its plan includes sufficient interest payments to compensate for the delay before full payment is made, the plan may satisfy the cram-down requirements.

Most chapter 11 cases do not end up with confirmed plans. This case may not be an exception. But this Court cannot find, at this stage of the case, that there is an "inability to effectuate a plan" or any other cause for dismissal under section 1112(b).

### C. *Prudential's Motion to Excuse the Receiver From His Obligations to Turnover and Account*

Sections 543(a) and (b) prohibit a "custodian" from taking any action with regard to property in their possession (except to preserve it); requires a custodian to deliver that property to a debtor in possession or trustee; and to account for any property of the debtor that at any time came into the custodian's possession, custody or control. A court-appointed receiver, such as Mr. Barrett, is a "custodian." 11 U.S.C. § 101(11). Section 543(d), however, authorizes the Court to excuse compliance

with those obligations "if the interests of creditors ... would be better served by permitting a custodian to continue in possession, custody or control of such property...." Unlike section 305 (abstention), section 543(d) does not require or permit consideration of the interest of the debtor. 4 Collier on Bankruptcy ¶ 543.04 (15th Ed.)

■ Prudential has not asked for appointment of a trustee, although one may be appointed "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case...." 11 U.S.C. § 1104(a). The partners in the Debtor had as an anchor tenant an entity in which they had a substantial interest but which was unable to pay any rent for the more than one year it was in occupancy. Worse, they misrepresented the facts regarding that entity's history of rental payments to Prudential in the course of putting the Debtor under a burden of secured debt it could not carry. The partners did that to reduce their own personal obligations. The center is now only 50% occupied and is worth less than when the Debtor bought it about two years ago.

These facts would constitute grounds for the appointment of a trustee, but Prudential—by far the largest creditor—apparently prefers the receiver whose appointment it obtained in the foreclosure case. Mismanagement has been cited as one ground for allowing a pre-bankruptcy receiver to remain in possession. *In re WPAS, Inc.*, 6 B.R. 40 (Bankr.M.D.Fla.1980). Other creditors (except the taxing authority, which will be paid in any event) have no hope of recovery unless the value of the center is enhanced. Since Prudential is now about $3 million under-secured, it and the receiver have a substantial interest in enhancing that value. There is, therefore, no reason to believe that other creditors' interests will suffer by keeping the debtor out of possession of the property. Indeed, if it should be necessary to advance funds for operating expenses or tenant improvements, Prudential is more likely to cooperate in that regard with a receiver in place.

Moreover, although this court cannot find that the Debtor has no hope of confirming a plan, it is obvious that prospects for successful reorganization are speculative. This, too, is a factor to consider. *In re Powers Aero Marine Serv. Inc.*, 42 B.R. 540 (Bankr.S.D.Tex.1984).

■ The Court will, for these reasons, excuse Mr. Barrett from compliance with section 543(a) (prohibiting any action with regard to the property under his control) and (b)(1) (requiring turn over of that property). In addition, pursuant to section 105(a), in order to carry out the purpose of section 543(d), the automatic stay will be modified to enable Mr. Barrett to complete the process of taking control of the Debtor's property, and the Debtor will be ordered to cooperate in that process by promptly delivering to the receiver such books, records and other property as he may request and delivering to him any rents or other proceeds of the shopping center in the Debtor's possession. The receiver will manage the property in accordance with his responsibilities under Illinois law, as may be modified by this Court from time to time.

■ There is no reason to excuse the receiver from the accounting requirements of section 543(b)(2), and the receiver will comply with that provision. Moreover, the receiver will be ordered to cooperate with the Debtor's efforts to rent space in the shopping center. The Debtor retains the right to attempt to reorganize and the receiver should not interfere with that right.

D. *Prudential's Motion to Prohibit the Use of Cash Collateral and Debtor's Motion for Authority to Use Cash Collateral and Complaint to Compel Receiver to Turnover Property*

Because of the relief granted above, the remaining matters can be dealt with quickly. For the reasons set forth in the discussion of Prudential's motion to excuse compliance with sections 543(a) and (b), judgment will be entered against the Debtor on its complaint to compel turnover by the receiver. The cross-motions regarding

cash collateral are moot because the receiver will have the exclusive right to collect rents and use the proceeds, subject to order of this Court.

Prudential is directed to submit draft orders (one disposing of the motions and one disposing of the adversary proceeding) in accordance with the foregoing within seven days.