**In re BELLEVUE PLACE ASSOCIATES, an Illinois General Partnership, Debtor.**

**Bankruptcy No. 94 B 9270.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Aug. 29, 1994.

Kathryn M. Gleason, Office of U.S. Trustee, Chicago, IL.

J. Douglas Bacon, Latham & Watkins, Chicago, IL.

David Heroy, Lawrence M. Benjamin, Neal Gerber & Eisenberg, Chicago, IL.

Steven Towbin, Michael Golde, D'Ancona & Pflaum, Chicago, IL, for debtor.

Gus A. Paloian, Marie Appleby, Seyfarth Shaw Fairweather & Geraldson, Chicago, IL, Chapter 11 Trustee.

James H.M. Sprayregen, Wendy L. Chronister, Matthew N. Kleiman, Kirkland & Ellis, Chicago, IL, for Caisse Centrale des Banques Populaires.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MOTION TO ABSTAIN OR DISMISS OF CAISSE CENTRALE DES BANQUES POPULAIRES

JACK B. SCHMETTERER, Bankruptcy Judge.

## I. FINDINGS OF FACT

A. *The Principal Parties and Their Claims Against the Debtor.*

1. On May 9, 1994, Bellevue Place Associates ("BPA" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. JE 57.[1] No official committee of unsecured creditors has been appointed to serve in the Debtor's reorganization case.

2. The Debtor is an Illinois general partnership, the administrative general partner of which is Twenty–One East, Inc. ("Twenty–One"), a Delaware corporation. JE 45. The Debtor is solely engaged in the business of owning a hotel which is commonly known as Le Meridien Chicago Hotel (the "Hotel") located at 21 East Bellevue Place, Chicago, Illinois.

---

1. References to Joint Exhibits are designated "JE."

2. References to the trial transcript are designated "Tr."

3. Caisse Centrale des Banques Populaires (the "Bank") is a French banking corporation. It is approximately the eighty-third largest bank in the world with $60 billion (USD) in assets. As part of a broader transaction (the "1990 Refinancing") that also included MHIG and MHI (as those terms are defined below), the Bank lent certain funds to the Debtor that were, *inter alia,* used to satisfy the Hotel's existing mortgage indebtedness. Tr. 327.[2] At the time of the 1990 Refinancing, the Bank did not expect the Hotel's operations to cover the Bank's interest charges until the fourth year after it was made. JE 65. The Bank expected the shortfall to be funded by MHIG pursuant to the Cash Shortfall Agreement (as those terms are defined in Finding No. 5 below).

4. The Bank claims to hold first liens and security interests in and to substantially all of the assets of the Debtor by virtue of that certain Mortgage dated February 14, 1990. JE 3. As of the commencement of these proceedings, the Bank asserts that the Debtor was indebted to the Bank in the principal amount of $37 million, plus accrued interest, fees and costs for an approximate total amount of $41 million. JE 58. The Bank has stipulated that it is undersecured. Tr. 738–39.

5. Meridien Hotels Investments Group Inc. ("MHIG") is a Delaware corporation. As part of the 1990 Refinancing, MHIG guaranteed a portion of the Debtor's obligations to pay interest to the Bank and posted a letter of credit for that purpose. JE 53, 55. MHIG entered into an agreement with BPA (the "Cash Shortfall Agreement"), pursuant to which payments made by MHIG on account of the guaranty were deemed to constitute loans from MHIG to BPA. JE 53.

6. Pursuant to the Cash Shortfall Agreement, during 1990 and 1991, MHIG paid $5 million to the Bank for interest owed to the Bank by BPA and asserts a claim in that amount secured by liens on all, or substantially all, of the Debtor's assets.[3] JE 58.

---

3. The relative priority of the Bank's and MHIG's liens in certain assets of the Debtor, particularly the Hotel's revenues, is the subject of a separate adversary proceeding (94 A 891) herein.

7. Meridien Hotels, Inc. (MHI and, collectively with MHIG, "Meridien") is a New York corporation engaged primarily in the business of operating hotels in North America under the name Le Meridien. As part of the 1990 Refinancing, MHI and BPA entered into that certain Management Agreement dated as of February 14, 1990, as subsequently amended (the "Management Agreement"). As part of the execution of the Management Agreement, the Manager provided BPA with $3.5 million for *inter alia,* improvements to the Hotel. JE 5; Tr. 102. As a result, the name and the management of the Hotel were completely changed at that time.

8. MHIG is a wholly owned subsidiary of Societe des Hotels Meridien ("SHM"). Tr. 97. Air France owns approximately 57.32 percent of SHM, and Jacques Ehrmann, an officer of MHIG, testified that twelve different investors own the remainder. Tr. 98. The Republic of France owns Air France. *Id.* SHM has approximately $500 million in assets, $250 million in sales and $20 million in after tax profits. Tr. 100. It owns and operates approximately 60 luxury hotels in 35 countries worldwide. Tr. 101.

9. Pursuant to the Management Agreement, MHI has managed the day-to-day operations of the Hotel continuously since February of 1990. Tr. 463. As of the commencement of these proceedings, MHI asserts that the Debtor was indebted to MHI in the approximate amount of $124,000, plus accrued interest, fees and costs allowable under the terms of the Management Agreement. JE 58.

B. *The Master Agreement and Events Leading to this Chapter 11 Case.*

10. By 1993, BPA found itself in significant disputes with Meridien. Tr. 373–74. It had defaulted on its obligations to the Bank, which in December 1993 announced an intention to foreclose on its mortgage. JE 12, 13. In addition, Meridien contended that BPA had violated certain terms of the Management Agreement, including without limitation, that Agreement's requirements that the Debtor (i) provide the Hotel with certain

levels of working capital, (ii) fund an appropriate reserve for furniture, fixtures and equipment expenditures and (iii) make all required payments to the Bank. Tr. 163–64. Counsel for Twenty–One East testified that the Debtor was in a "two-front war" with deep-pocketed creditors, and concluded that it could not fight both of them. Tr. 373–74.

11. On January 11, 1994, the Bank filed a complaint to foreclose its mortgage in the Circuit Court of Cook County, Chancery Division (the "Foreclosure Action") together with a motion to be placed in possession of the Hotel. Tr. 147–48. On January 12, 1994, the Court entered an order (the "January 12 Order"), which required MHI to continue managing the day-to-day operations of the Hotel, but did not expressly provide for payment of MHI's management fees. The January 12 Order did expressly authorize payment of reasonable operating expenses necessary to carry on the day to day operations of the Hotel. JE 6. Meridien filed its Motion To Vacate the January 12 Order and the parties continued the motion from time to time while attempting to negotiate an agreed resolution of the matter. JE 21, 51.

12. Meanwhile, BPA also negotiated with the Bank prior to commencement of the Foreclosure Action. David Gregg, counsel for Twenty–One, testified that the Bank "wanted its $41 million, and the property was not worth that; and we quickly reached loggerheads over the issue." Tr. 368. A principal of the Bank testified that any proposal offering the Bank less than full recovery was not considered a "valid" one. Ex. B–3 at 73.[4]

13. Mr. Gregg testified that following commencement of the Foreclosure Action, BPA had essentially four alternatives. It could (1) continue to defend the Foreclosure Action, (2) file a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and attempt to reorganize on its own, (3) reach an agreement with the Bank, or (4) reach an agreement with Meridien. Tr. 378–80. BPA did not believe that it could successfully fight the Foreclosure Action or file a chapter 11 petition unless it settled with either Meridien or

---

4. References to BPA's trial exhibits are designated "Ex. B."

the Bank. *Id.* Given the Bank's negotiating position, BPA believed its best chance to reorganize was to settle with Meridien. *Id.*

14. Thereafter, BPA, its equity holders and Meridien engaged in prolonged, arms-length negotiations aimed at resolving the numerous disputes between them. Tr. 105. Joseph Mawad, a representative of Twenty–One (through Mr. Gregg, its counsel) negotiated the Master Agreement on behalf of the BPA Parties.[5] These negotiations culminated in the Master Agreement dated March 23, 1994 by and among the "BPA Parties," Meridien and certain of Meridien's affiliates. JE 1.

15. Pursuant to the Master Agreement, Meridien received, *inter alia,* voting proxies pertaining to the stock of the corporate partners in BPA, thereby permitting Meridien to have sole control over all subsequent workout and reorganization proceedings regarding BPA for the duration of the proxies. *Id.* In return, pursuant to the Master Agreement, certain of the BPA Parties received, *inter alia,* $500,000 (approximately $200,000 of which was used to pay professionals' fees incurred by BPA and Twenty–One) in the aggregate and Meridien's agreement to take "Reasonable Action" to effect a workout or reorganization of BPA's affairs.[6] *Id.* No evidence of how the remaining $300,000 was divided among the Stockholders (as defined in the Master Agreement) was presented at trial. The BPA Parties and Meridien also exchanged mutual releases and agreed to modify and extend the term of the Management Agreement, pursuant to which Meridien had begun to improve the Hotel's operating performance as described more fully

below. Mr. Gregg testified that the Master Agreement thereby provided BPA with an opportunity to reorganize, pay its creditors and preserve at least some value for its equity holders. Tr. 374–80.

16. Following execution of the Master Agreement, Meridien elected three of its employees (Jacques Ehrmann, James F. Brooks and Joseph M. Piantedosi) to serve as directors and officers of Twenty–One. Pursuant to Sections 6.4 and 6.5 of the Master Agreement, Ernst & Young ("E & Y") and D'Ancona & Pflaum ("D & P") would serve as BPA's accountants and counsel, respectively. Meridien received the right to replace E & Y and/or D & P at any time. JE 1.

17. Although BPA, Twenty–One and BPALP are controlled by Meridien through the Master Agreement, no evidence was presented suggesting that BPA has dissolved. Tr. 972. As of the close of evidence on June 21, 1994, BPA still has a legal existence. *Id.*

18. While Meridien and the BPA Parties negotiated the Master Agreement, the Bank continued to prosecute the Foreclosure. Action against BPA, Meridien and the other defendants therein. On April 11, 1994, Judge Berman, the judge presiding in the Foreclosure Action, announced that he did not "think its proper to have somebody who has a financial interest" to manage the Hotel. JE 7 at 20–21. Stating that the Manager had a "financial interest" in the Hotel because of MHIG's $5 million mortgage on BPA's real and personal property, Judge Berman invited the Bank to move for replacement of the Manager and announced

---

5. The "BPA Parties," as defined in the Master Agreement were

   (i) BPA; (ii) the two partners in BPA, Twenty–One and BPALP; (iii) Rush–Bellevue Development Corporation, the general partner in BPALP; and (iv) MAC N.A., Inc., James D. Hummert and James A. Hummert, the shareholders of Twenty–One and RBDC.

6. Under the Master Agreement, Meridien was "deemed to have taken "Reasonable Action" by taking such action as it may reasonably deem appropriate in order to achieve an Acceptable Arrangement. Without limiting the foregoing, the taking of the following actions shall mean for

all purposes that Meridien has taken "Reasonable Action" as required [by the Master Agreement]:

   (i) The expenditure by Meridien and the BPA Parties (acting under the control of Meridien), or any of them, of an aggregate of $300,000 for legal and other professional or consulting fees and disbursements from and after the date [of the Master Agreement] in connection with the Foreclosure Action, or a prospective Workout or Reorganization; and
   (ii) If BPA is in proceedings under Chapter 11 of the Code (the "Case"), BPA (acting under the control of Meridien) having filed a plan of reorganization in the Case."

that any replacement manager must not have a financial interest in any hotel. *Id.*

19. On May 6, 1994, Judge Berman indicated that he was prepared to accept one of the Bank's recommended substitutes but allowed Meridien an opportunity to demonstrate good cause why it should not be replaced. JE 72. The matter was set for an evidentiary hearing on May 9, 1994. *Id.*

20. Removing Meridien as manager of the Hotel would have caused a loss in revenue to the Hotel due to, *inter alia*, (i) removal of Meridien's reservation system, (ii) loss of the Meridien name, and (iii) loss of good will. The potential short term loss of revenue due to a change in management was estimated by BPA's expert Daniel W. Daniele, to be $1,132,616.00. JE 63; Tr. 264–65. Even the Bank's witness, Mr. Therond, conceded that it would be "ridiculous" to change management in the short term. Tr. 705.

21. MHI may have a contingent claim upon rejection or breach of the Management Agreement, which claim was estimated by Mr. Daniele at approximately $4 million. Tr. 266–70. Although the Bank has offered to pay the unsecured trade creditors in full if this Court abstains from hearing or dismisses this case, the Bank has not offered to pay anything to MHI on account of its asserted rejection claim. CCBP Ex. 50; Tr. 721–22.[7] Accordingly, the bankruptcy court is the only forum in which all claims against the Debtor can be appropriately administered.

22. In order to avoid the potential losses that could result from a change in management and to utilize the only legal forum that could administer all claims against BPA, and after advice from D'Ancona & Pflaum, Twenty-One's directors authorized BPA's attorneys to commence this chapter 11 case. Tr. 123–25.

### C. *The Debtor's Hotel.*

23. The Debtor owns the Hotel and employs approximately 230–250 people to manage and operate it. JE 58, 59. In addition to the Manager's potential rejection claim described above, the Debtor's Schedules of Assets and Liabilities indicate that it has approximately 240 creditors (other than the Bank) holding claims of approximately $6 million, of which MHIG's claim is approximately $5 million. *Id.*

24. Mr. Daniele testified that the recovery time after a change in management and name of a hotel is at least three years, and that the Hotel has stabilized since its 1990 management and name change. Tr. 239, 242–43.

25. Mr. Daniele testified that BPA incurred substantial capital costs to improve and market the Hotel after Meridien became manager 1990. Tr. 244–45, 468–69. The marketing was necessary to win back the market share lost under prior management and to establish Le Meridien as a luxury hotel in Chicago. Tr. 244–45.

26. As demonstrated below by its increasing revenue and gross operating profit, the Hotel generally competes well in the market place:

| Year | Total Revenue | Gross Operating Profit |
|------|---------------|------------------------|
| 1991 | $ 9,670,541 | $ 933,601 |
| 1992 | $10,795,408 | $1,200,256 |
| 1993 | $11,900,511 | $2,295,991 |

Tr. 971; JE 19.

27. The Hotel's occupancy rates from 1991 through 1994 are equivalent to at least 90 percent of the occupancy rates achieved by certain other luxury hotels in Chicago. Ex. B–5. In the first quarter of 1994, the Hotel's occupancy rates were nearly identical to the occupancy rates of certain other luxury hotels in Chicago. Ex. B–5.

28. The Hotel continues to be competently managed and operated by the Manager. Tr. 249. The Manager has increased the Hotel's market penetration, taking more business from its competitors in each year since it became Manager in 1990. Tr. 242, 971. This is shown by the fact that the Hotel's occupancy rate in 1992 increased 6.6% while the occupancy rates of comparable hotels increased only 3.8%. Ex. B–5. Similarly, in 1993, the Hotel's occupancy rate increased 12.9% while the occupancy rates of comparable hotels increased only 7.1%. Ex. B–5. In 1993, the Manager also doubled the Hotel's income before fixed charges, increas-

---

**7.** References to CCBP's trial exhibits are designated "CCBP Ex."

ing it from 8.1 to 16.3 percent of total revenue. Ex. B–5; Tr. 247–48.

29. The Hotel is currently meeting its budget projections for 1994 and is current in the payment of all post-petition taxes. Tr. 482–83, 677; JE 20. No post-petition real estate taxes are yet due.

30. There has been no evidence of fraud, dishonesty or gross mismanagement in connection with the management of the Hotel.

D. *The Debtor's Plan of Reorganization and Disclosure Statement.*

31. The Debtor filed a plan of reorganization (the "Plan") and disclosure statement (the "Disclosure Statement") on May 17, 1994, eight days after it filed its chapter 11 petition but has since withdrawn them. JE 60, 61. The Bank has not demonstrated that the Debtor will not be able to present a confirmable plan of reorganization taking advantage of its rights under the Bankruptcy Code. However, for reasons separately set forth in Findings and Conclusions, this Court ordered appointment of a Chapter 11 Trustee.

32. Any conclusions of law set forth in these findings of fact should be deemed included in and incorporated by the following section, and any findings of fact set forth in the following conclusions of law and remarks of the Court from the bench following trial should be deemed included in and incorporated by the preceding paragraphs as additional findings of fact.

## II. CONCLUSIONS OF LAW

A. *This Court Has Jurisdiction Over This Matter.*

33. This Court has subject matter jurisdiction over this case and this proceeding under 28 U.S.C. 1334 and Local District Court Rule 2.33. This matter constitutes a core proceeding under 28 U.S.C. 157(b)(2)(A).

B. *This Court Will Not Abstain Under Section 305.*

34. This Court has discretion under section 305 of the Bankruptcy Code to determine whether abstention would serve the best interests of the Debtor and all of its creditors. *See In re Foundry of Barrington Partnership,* 129 B.R. 550, 555 (Bankr. N.D.Ill.1991) (emphasis in original).

35. Courts have refused to abstain where abstention would serve only the interests of one mortgagee seeking to obtain possession of the property. *See, e.g., In re Foundry of Barrington Partnership,* 129 B.R. at 555; *In re Justus Hospitality Properties, Ltd./In re Justus Hotel Corporation,* 86 B.R. 261, 266 (Bankr.M.D.Fla.1988); *In re Sky Group International, Inc.,* 108 B.R. 86, 91 (Bankr. W.D.Pa.1989).

36. Abstention is not in the best interests of the Debtor and Meridien. The Debtor has demonstrated a need and the right to an opportunity to reorganize. The evidence shows that the Hotel is a viable business that competes well in the market place and generates enough cash to pay its trade creditors in the ordinary course of business, but not enough to pay the debt service on its mortgages. The fact that the Debtor is controlled by Meridien is no basis for denying the Debtor the opportunity to reorganize its capital structure.

37. Furthermore, abstention would put the Debtor—which voluntarily sought chapter 11 relief—at risk of losing its principal asset in the Foreclosure Action, while depriving it and its creditors of all of the protections and remedies available under the Bankruptcy Code that are unavailable in a state foreclosure proceeding. Since the Debtor (albeit controlled by Meridien) is actively utilizing these remedies—proposal of a "new value" plan, assumption of executory contracts (including, among others, the Meridien Management Agreement), settlement of various claims and use of the automatic stay to assist in the orderly payment of its debts—abstention under section 305 is inappropriate.

38. Although the Bank has offered to pay the Debtor's unsecured trade creditors in full if this Court abstains from or dismisses this case, the Bank's offer does not present a sufficient basis on which to abstain under Section 305. Beyond MHI's asserted management fees of approximately $124,000 (if proven valid), the Bank has not agreed to

pay any unsecured claims that might ultimately be held by Meridien. Thus, this is not a situation where an arrangement is being worked out by creditors and the Debtor out of court and there is no prejudice to the rights of creditors in that arrangement.[8] Abstaining from hearing this case is not in the best interest of the Debtor or Meridien, regardless of whether the Bank pays certain creditors in full, because it is likely that neither BPA's equity holders nor MHI will receive anything in the event of foreclosure and because the Bank has not demonstrated that the Debtor does not have a reasonable chance to propose and confirm a plan. Abstention is therefore inappropriate in this case.

### C. There Is No Cause For Dismissal Under Section 1112(b).

39. Section 1112(b) of the Bankruptcy Code provides that a court may dismiss or convert a case for "cause." None of the enumerated provisions in section 1112(b) are applicable in this case. In addition, the Bank alleged that the Debtor filed its petition in "bad faith."

■ 40. Many courts recognize bad faith as cause for dismissal under section 1112(b). See In re International Oriental Rug Center, Inc., 165 B.R. 436, 442 (Bankr.N.D.Ill.1994) ("Although bad faith is not one of the ten grounds for dismissal promulgated in 11 U.S.C. 1112(b), circuit courts have recognized and affirmed the authority of bankruptcy courts to dismiss Chapter 11 cases that fail to meet a good faith standard."), citing In re Madison Hotel Associates, 749 F.2d 410, 426 (7th Cir.1984); In re Natural Land Corp., 825 F.2d 296 (11th Cir.1987); In re Little Creek Development Co., 779 F.2d 1068 (5th Cir.1986). Although these cases set forth many factors to consider in determining whether the debtor filed in bad faith, no one

factor is determinative. Rather, the court must look at all of the facts and circumstances to determine whether the debtor has a need and ability to reorganize under Chapter 11. See In re Foundry of Barrington Partnership, 129 B.R. 550, 556 (Bankr. N.D.Ill.1991) (finding that the principal inquiry for purposes of determining good faith is whether the debtor has a need and ability to reorganize). As Judge Posner stated in Matter of James Wilson Associates, 965 F.2d 160, 170 (7th Cir.1992), "[t]he clearest case of bad faith is where the Debtor enters Chapter 11 knowing that there is no chance to reorganize his business and hoping only merely to stave off the evil day when the creditors take control of the property."

41. In Matter of James Wilson Associates, 965 F.2d 160, Judge Posner went on to find no indication of bad faith from the mere fact that a single asset debtor filed its petition after the mortgagee brought a foreclosure action in state court and obtained a receiver to collect the rents. The Seventh Circuit held that the debtor there legitimately filed its chapter 11 petition to reorganize its debt and regain possession of the building and rents.[9]

■ 42. BPA's bankruptcy case is well within the Seventh Circuit's definition of a legitimate filing. At the direction of the Twenty–One East board of directors (composed of individuals selected by Meridien), the Debtor filed its petition not simply to "stave off the evil day" of foreclosure, but rather in order to (a) avoiding the damage that would have occurred to the Hotel and the Debtor's ability to reorganize had the Bank successfully terminated Meridien Hotels, Inc. as manager of the Hotel,[10] and (b) seeking relief in the only forum that could administer all claims against BPA. The plan of reorganization filed by BPA, albeit with-

---

8. See House Report No. 95–595, 95th Cong., 1st Sess. 325 (1977); Senate Report No. 95–989, 95th Cong., 2nd Sess. 35 (1978) U.S.Code Cong. & Admin.News 1978, p. 5787.

9. Id. at 171.

10. The State Court had indicated its belief that property subject to a foreclosure action could not be managed by an entity having a "financial

interest" in that property. A hearing on the replacement of MHI as manager of the Hotel together with Meridien's motion to vacate the January 12 Order was set for the day that this case was filed. Had Meridien been replaced, the Debtor believed it would have suffered more than $1 million of short-term cash loss due to removal of Meridien's reservation system and lost Meridien as funder of its Plan.

drawn, reinforces this conclusion. The Bank has not demonstrated that the Debtor does not have the ability to reorganize.

43. Meridien's control over BPA is not cause for dismissal of this case. In *In re Justus Hospitality Properties, Ltd./In re Justus Hotel Corporation,* 86 B.R. 261, 265 (Bankr.M.D.Fla.1988), a creditor assumed ownership and operation of the debtor's hotel, and the court found that the debtors did not file in bad faith because the debtors were:

> in serious need of this Court's protection to enable them to preserve their going concern value. If this protection were not available, the debtor's assets would be dismantled by foreclosure suits, unsecured creditor suits, cancellation of its franchise, etc. There would be little left for the benefit of creditors.

*Id.* at 265. While the Bank can be expected to contest confirmation of the Debtor's plan on a variety of issues, there is no cause to dismiss the case under section 1112(b).

The problems that did result from Meridien's total control of debtor in bankruptcy were resolved by appointment of a Chapter 11 Trustee, for reasons previously set forth in Findings and Conclusions.

D. *There is No Cause to Lift the Stay Under § 362(d)(1).*

44. The Bank's Motion for § 305 Abstention From and/or § 1112 Dismissal of Chapter 11 Case also requested this Court to terminate the automatic stay pursuant to 11 U.S.C. § 362(d)(1) for cause due to, *inter alia,* Meridien's control over BPA. Section 362(d)(1) requires a court to grant relief from the stay "for cause, including the lack of adequate protection of an interest in property...." The Bank stipulates that it is undersecured, and there is no evidence indicating that its interest in the Hotel is diminishing in value or is not otherwise adequately protected. Furthermore, there is no "cause" to grant relief from the stay in light of this Court's earlier findings that the Bank has not met its burden of showing that the petition was filed in bad faith.

Under § 362(d)(2), when debtor lacks equity in the security, it has the burden of showing that a viable plan of reorganization is in prospect within a reasonable time. *U.S. Savings Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 375–76, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988). That showing has been only weakly put forward thus far, and no Plan by debtor is presently being advanced. However, even if the debtor proves unable to do so, once a Chapter 11 Trustee is appointed, the reasonableness of time under § 362(d)(2) must take into account the presence of that new party's availability to negotiate and propose a plan. It presently appears that the elements of a confirmable plan can be put together by the Chapter 11 Trustee.

Accordingly, the Bank's request for relief from the automatic stay is denied at this time without prejudice to renewal should debtor or Trustee not advance a particular confirmable plan within a reasonable time or should any new showing be made to demonstrate other cause.