In re Paolo GUCCI, et al., Debtors.

Bankruptcy No. 94 B 40614 (JHG).

United States Bankruptcy Court, S.D. New York.

Oct. 12, 1994.

---

29. The Debtors do not deny that failure to pay premiums was a valid reason for termination.

Schulte Roth & Zabel by Frederick Rosner, New York City, for Status Eyes.

Michael S. Kimm, New York City, for Trackwise.

Corash & Hollender by Paul Hollender, Staten Island, NY, for Paolo Gucci.

Winick & Rich by Jonathan L. Flaxer, New York City, for Frank G. Sinatra, Chapter 11 Trustee.

Frank G. Sinatra, Chapter 11 Trustee, New York City.

Rudes, Lax, Berkowitz and Mittman by Saul Rudes, Alan E. Bandler, New York City, for Enzo Stancato and LBP.

Tanner Propp & Farber by Allan C. Samuels, New York City, for Orologgi Paola, Inc.,

Ultima Intern. Pens & Accessories, Inc., Ultima Intern. Watches, Inc.

Sylvor, Schneer, Gold & Morelli by Richard L. Gold, New York City, for Joseph DeLeo d/b/a JDL Enterprises.

Bronstein, Van Veen & Bronstein, P.C. by Ann Cynthia Diamond, Donovan, Leisure, Newton & Irvine by A. Peter Lubitz, New York City, for Jennifer Gucci.

Gibson, Dunn & Crutcher by Marshall R. King, New York City, for Creditors' Committee.

Arthur J. Gonzalez, U.S. Trustee, New York City.

## DECISION ON MOTIONS TO DISMISS AND FOR SUBSTANTIVE CONSOLIDATION OF THE BANKRUPTCY CASES

JEFFRY H. GALLET, Bankruptcy Judge.

### I. INTRODUCTION

Before me are three motions.[1] Because they are interrelated, I will decide them together. First are motions[2] filed by Status Eyes Ltd. ("Status Eyes") and Trackwise Sales Corporation ("Trackwise") to dismiss the Chapter 11 cases[3] of Paolo Gucci ("Gucci"), Millfield Stables Ltd. ("Millfield") and Paolo Gucci Arabians Establishment Vaduz ("PGAEV") pursuant to 11 U.S.C. § 1112(b), on the grounds that the cases were filed in bad faith. In addition, Trackwise has moved for sanctions under Bankruptcy Rule 9011.

Second is a motion[4] by Enzo Stancato and Licensing by Paolo, Inc. ("Stancato")[5] for an order dismissing the six cases filed by Gucci's Chapter 11 Trustee, PG Properties II, Inc. ("PG Properties"), PG Yorktown Properties,

1. Subject matter jurisdiction arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A).

2. Status Eyes and Trackwise submitted separate motions. However, because the issue is the same, the motions will be decided together.

3. Trackwise seeks only to dismiss the case of Paolo Gucci. In addition, Enzo Stancato and Licensing by Paolo support the motions to dis-

miss on the grounds of bad faith. (Collectively Status Eyes, Trackwise and Stancato will be referred to as the "Movants")

4. Status Eyes amended its first motion to dismiss in order to add the six newly filed cases.

5. Previously, Licensing by Paolo ("LBP") represented by Alfredo Versace ("Versace"), a separate entity from the movant, had moved to dismiss the first three Gucci cases. That motion had been withdrawn. Both Stancato and Versace claim ownership to the shares of LBP, however, that issue is not before me.

Inc. ("PG Yorktown"), Millfield Stables, Inc. ("Millfield Inc."), Millfield Stables III, Inc. ("Millfield III"), Millfield Farms Establishment Vaduz ("MFEV") and Portwell, Ltd. ("Portwell"). (Collectively the "Related Entities"), on the grounds that Frank G. Sinatra, the Trustee (the "Trustee"), did not have authority to file the cases. The Trustee, Guccio Gucci ("GG"), Jennifer Gucci, the United States Trustee, and the Creditors' Committee [6] oppose the motions.

Third is a motion by the Trustee for substantive consolidation of all of the chapter 11 cases. Status Eyes opposes the motion. The Creditors' Committee, Jennifer Gucci and GG support it.

Significantly, none of the debtors has filed papers in response to the motions. However, Gucci's counsel, in open court, first announced that he opposed the motions to dismiss but subsequently has changed his position. None of the other debtors are represented by counsel.

## II. STATEMENT OF FACTS

### A. Bankruptcy Related Proceeding

On February 8, 1994, Gucci filed his chapter 11 case. Subsequently, Millfield filed on February 18, 1994 and PGAEV on February 24, 1994. On March 30, 1994, the United States Trustee's motion for appointment of an interim chapter 11 trustee was granted in the cases and an order signed on April 8, 1994. On June 20, 1994, the Trustee filed voluntary petitions on behalf of PG Properties and PG Yorktown. On June 23, 1994, he filed voluntary petitions on behalf of Millfield, Inc., Millfield III, MFEV and Portwell. The cases have been consolidated for procedural purposes only.

### B. The Status Eyes License

In March 1989, Status Eyes began negotiations with Gucci for a license to use his name and designs in connection with the manufacture of eyeware products. The negotiations culminated in a licensing agreement between Status Eyes and Gucci's licensing company, Creazioni Creative Corp. ("CCC"), dated July 1, 1989, (the "Agreement").

Subsequently, Status Eyes commenced an action in the United States District Court for the Southern District of New York against Gucci, CCC, P.G. Creative, Ltd., P.G. Creative, Inc., and Paolo Group Designs, Inc. (the "District Court Action") alleging breach of contract, fraudulent inducement and tortious interference with the Agreement.

As part of the District Court Action, Judge Pierre N. Leval [7] entered a temporary restraining order (the "TRO") on July 9, 1993, under which Gucci, his agents, representatives, employees, nominees, and all persons and entities acting in concert and participation with him were enjoined from transferring any interest in the ownership of certain horses or of any entity in which Gucci had an interest.[8]

On September 29, 1993, Judge Leval granted Status Eyes an order of attachment up to $15 million against all horses and horse farms covered by the TRO [9] in which Gucci had an interest.

### C. The Gucci Marital Action

In March, 1991, a divorce action entitled *Jennifer Puddefoot Gucci v. Paolo Gucci* (the "Divorce Action") was commenced in the New York Supreme Court. Certain relief has been granted in that action including: (a) an injunction enjoining and restraining Gucci and his agents from taking any action which would affect any assets or property now owned or held by Paolo Gucci; (b) five unsat-

---

6. The five members of the Committee are Orologgi Paolo, Inc., Ultima International Pens & Accessories, Inc., Ultima International Watches, Inc. and Ultima Pens & Accessories, Cedar Lane Farm, Inc., Corrado and Associates, Joseph DeLeo and Status Eyes.

7. Judge Leval has since been elevated to the Circuit Court of Appeals and Judge Robert Ward now presides over the District Court Action.

8. Motion by Status Eyes, Case No. 94 B 40614 (JHG) Doc. NO. 36. (Hereinafter Status Eyes' Motion), Ex. A.

9. Status Eyes' Motion, Ex. B.

isfied judgments for arrears in maintenance; and (c) the appointment of a receiver (the "Receiver").[10] In addition, Justice Phyllis Gangel–Jacob issued four orders holding Gucci in contempt of court as well as four warrants for his arrest.[11]

On January 12, 1994, Judge Ward entered an order which incorporated and harmonized the July 9 and September 29, 1993 District Court Orders with the order appointing the Receiver in the State Court Action.[12]

On March 23, 1994, Judge Ward entered judgment for Status Eyes in the amount of $16,376,050 against the corporate defendants named in the District Court Action.

### D. The Trackwise Litigation

Trackwise is a New Jersey corporation. Under an agreement dated July 15, 1990, Trackwise was granted the exclusive license for the Paolo Gucci name for the Republic of Korea. Gucci attempted to terminate the agreement and in November of 1993, Trackwise commenced an action before Judge Thomas Griesa, in the United States District Court for the Southern District of New York.

On December 10, 1993, Judge Griesa issued a preliminary injunction which prevented Gucci from attempting to terminate the Trackwise license during the pendency of the litigation.[13] In January, Gucci and his licensing agents, Soo Kim ("Kim") and Marketing Group Establishment ("MGE"), violated the preliminary injunction. On January 26, 1993, Judge Griesa found Gucci, Kim and MGE in contempt of court and levied sanctions of $10,000 a day. In addition, Judge Griesa ordered Gucci to write a letter of retraction to all of Trackwise's sublicensees in Korea advising them to proceed in the normal course of business as to the payment of royalty fees to Trackwise. Judge Griesa also directed Trackwise to send certain docu-

ments, necessary to maintain its present and existing trademark rights in Korea, to Gucci for signature.[14]

On February 10, 1994, due to Gucci's failure to comply with Judge Griesa's order, the sanction was doubled to $20,000 a day and arrest orders were prepared. On that same day, Trackwise's attorney received notice that Gucci had filed a petition under chapter 11 on February 8.

On February 13, Trackwise sent documents which were necessary to maintain its license agreement, as per Judge Griesa's direction, to Gucci. On that same day, Trackwise's attorney received a facsimile from Gucci's then bankruptcy counsel advising him that Trackwise would be in violation of the Bankruptcy Court's automatic stay if Trackwise continued to follow the terms of Judge Griesa's order. In addition, Gucci's counsel advised Trackwise that it was in the process of moving before the Bankruptcy Court to reject the Trackwise license.[15] Later that day, Trackwise obtained an "Order to Show Cause for Further Contempt" from Judge Griesa which allowed it to pursue implementation of his pre-bankruptcy contempt related orders.[16]

On February 22, Gucci submitted an Order to Show Cause, including a temporary restraint on Trackwise from enforcing Judge Griesa's Contempt Order, to me. I declined to sign that order.

On February 23, Judge Griesa issued an Ex Parte Order Supplementing the "Order to Show Cause for Further Contempt," restraining the contempt-respondents, Gucci, Kim and MGE from interfering with the District Court contempt proceedings.[17] In addition, on the same day, Gucci filed a motion before me to reject the Trackwise licensing agreement.

---

**10.** By order of this court of February 23, 1994, the Receiver was left in place.

**11.** On April 7, 1994, Gucci was arrested pursuant to the Arrest Warrants.

**12.** Status Eyes' Motion, Ex. C.

**13.** Affirmation of Michael S. Kimm in support of Trackwise motion to dismiss, Case No. 94 B

40614, Doc. No. 59, Ex. 3. (Hereinafter Kimm Aff.)

**14.** Kimm Aff. ¶ 11.

**15.** Kim Aff. ¶ 15.

**16.** Id. ¶ 16.

**17.** Id. Ex. 9.

On April 13, 1994, Judge Griesa, withdrew the reference as to all matters related to Trackwise from the bankruptcy reference.[18]

### E. The Bankruptcy Cases

#### 1. Paolo Gucci

##### a. The Petition

On February 8, 1994 Gucci filed a petition under chapter 11 of the Bankruptcy Code. The petition was signed by Kim. Although the petition seems to suggest that Kim is signing as Gucci's representative, it is devoid of information which would support Kim's authority to sign for Gucci, and no such information has been filed with the court. Apparently, Kim is the licensing agent for MGE. In addition, MGE appears to be a competitor of Trackwise.[19] Gucci has not challenged Kim's authority to act for him and has proceeded, by counsel, with this case.

##### b. Rule 52 Affidavit

The Local Rule 52 Affidavit requires every debtor to list the location of its substantial assets, the location of its books and records, and the nature, location and value of assets held by such debtor outside the territorial limits of the United States.[20] Although Gucci lists rights under various licensing agreements as his substantial assets outside the territorial United States, it is the belief of Status Eyes that Gucci owns substantially more assets, and that some of those assets were transferred in violation of the TRO and Judge Leval's Attachment Orders. New York State Supreme Court Justice Phyllis Gangel–Jacob, who presides over the matrimonial action, found that:

> Gucci's assertions that he has no ownership interests in the horse farm at issue or in the record owner corporate entities thereof are disingenuous. Throughout all

the proceedings before this court it has become increasingly obvious that defendant has manipulated his business activities to cloak or disguise his ownership interests by structuring an elaborate, complex network of U.S. and offshore closely held corporations which, at best, operate in a titular capacity under the direction of and to the ultimate benefit of the defendant.[21]

##### c. Schedules

Gucci filed the schedules to his petition on June 8, 1994, approximately a month after the petition was filed. However, the accuracy of the schedules, to say the least, is questionable. For example, Gucci's schedule of executory contracts fails to list even the contracts he moved to reject.[22]

Gucci's answer to the requirement that he list all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning relief under the bankruptcy law was "none." However, the "Affidavit of Disinterestedness," which was filed by Gucci's then bankruptcy counsel, Nutović & Lichtenberg, states that $30,000 was paid to Nutovic & Lichtenberg, by a third party, on behalf of Gucci.

In reply to a question requiring him to list his interest in any businesses, Gucci responded "none." However, Justice Gangel–Jacob found that he had an interest in several corporations. In addition, Gucci's answer to this question contradicts his assertion to Chief Judge Burton R. Lifland, of this court, that he may have an interest in property which was subject to a distribution in the Canalco Place bankruptcy, Case No. 93 B 43385.[23]

---

**18.** On April 13, 1994 Judge Thomas Griesa withdrew the reference as to all matters concerning Trackwise. Although it could be construed that the order withdrawing the reference has stripped Trackwise of the standing necessary to pursue this motion, I have decided to include its motion since the issue is not independent of the other motions before me.

**19.** Kimm Aff. p. 9.

**20.** Local Bankruptcy Rule 52(a)(10).

**21.** November 17, 1993 Decision and Order of Justice Phyllis Gangel–Jacob.

**22.** Status Eyes' motion, Ex. G. Gucci filed a motion to reject the licensing and sub-licensing agreement contracts of Licensing by Paolo and Creazioni on February 23, 1994.

**23.** Id., Ex.I.

Gucci was required to list all accounts receivable and other liquidated and unliquidated or contingent debts owed to him. To this question, Gucci answered "none." However, in the motion to reject the LBP license, Gucci states that "LBP has defaulted under its obligations pursuant to the LBP contract in that it has failed to remit the royalties income to the debtor." [24]

Finally, Gucci was required to list his current income. He answered "nil." However, he claims monthly expenses of $12,800.

### 2. Millfield Stables

#### a. The Petition

On February 18, 1994, Millfield filed a chapter 11 case. The petition was signed by Stanley Rosenkrantz pursuant to a power of attorney. The power of attorney was signed by Clive Dakin, Millfield's president, who resides in Bermuda. The petition states that Millfield has no employees and that its estimated cash receipts and disbursements for the 30 day period following the petition will be "$0." The petition was filed without schedules or a tax identification number. On April 11, 1994, I extended the time for Millfield to file its schedules and statement of financial affairs to April 20, 1994. That deadline has neither been met nor or extended.

Gucci is listed as one of Millfield's largest and undisputed creditors, with a claim of $152,331.70. The petition states that an entity called Maroder Stiftung, directly or indirectly, owns, controls or holds, with power to vote, 20% or more of Millfield's voting securities. Maroder Stiftung is also listed as having an undisputed claim of $8 million.[25] It has not appeared in this proceeding.

### 3. Paolo Gucci Arabians Establishment Vaduz

On February 24, 1994, PGAEV filed a chapter 11 case. As with the Millfield case,[26] the petition was signed by Stanley Rosen-

24. Id., ¶ 18(c)

25. Id., ¶ 19.

26. Currently, Neither Millfield nor PGAEV have counsel.

krantz, and filed without schedules. A similar order was entered extending the time to file schedules to April 20, 1994 with a similar result. In addition, no local Rule 52 Affidavit has been filed.

### F. Appointment of a Chapter 11 Trustee

On March 30, 1994, the United States Trustee moved for the appointment of a chapter 11 trustee in the Gucci, Millfield and PGAEV cases. The motion was based on many of the same facts which support the current motions to dismiss. On that date, I granted the motion. At that point, it was not only clear that Gucci had ignored orders of both state and federal courts, but also that he was a fugitive, subject to arrest on the New York State warrants. It was in the best interests of the creditors and the estate to have a trustee unravel and control Gucci's business affairs and secure his assets for the benefit of his creditors. The Trustee has successfully commenced those tasks.

### G. The Related Entities

In 1987, after selling his interest in the Gucci family business for approximately $40 million, Gucci established a network of trusts and corporations to hold his assets. It is argued that about $8,000,000 is being held in the name of Millfield and PGAEV. In addition, it is argued that assets valued at approximately $4 million are situated in England.[27]

The Related Entities appear to be part of a series of interrelated corporations, owned and controlled by Gucci, which are in the business of horse breeding and racing. They are:

(a) *PG Properties*—a Delaware corporation, which owns a 100 acre horse farm located in Spencertown, New York, (the "Spencertown Property"). It is argued that the PG Properties' assets are worth $500,000;

27. This property is the subject of a receivership action in the United Kingdom which was commenced by the Trustee.

(b) *PG Yorktown*—a Delaware corporation, which owns a 39.6 acre horse farm in Yorktown Heights, New York, (the "Yorktown Property"). The property includes a home known as Millfield House (used by Jennifer Gucci), as well as stables. It is argued that the PG Yorktown's assets are worth $2,500,-000;

(c) *Millfield Inc.*—a Delaware corporation, which operates the stables located on the Yorktown and the Spencertown Properties. The extent of its assets is not known;

(d) *PG Vaduz*—a Liechtenstein entity, which owns Arabian horses located at the Yorktown Property, the Spencertown Property, and, perhaps, other locations. Practically all of the assets of PG Vaduz have been sold by the Receiver and approximately $290,000 of the proceeds are being held by the Trustee;

(e) *Millfield III*—a Delaware corporation established to own and breed horses at both the Yorktown and Spencertown Properties. Its assets are unknown;

(f) *MFEV*—a Liechtenstein entity, established to own and breed horses at the Yorktown and Spencertown Properties and in England. It is alleged that many of the horses owned by MFEV were sent to England in violation of court orders. It appears that the MFEV assets are worth approximately $2,000,000; and

(g) *Millfield Ltd.*—a Bermuda corporation established to own and breed horses at the Yorktown and Spencertown Properties. Substantially all of Millfield Ltd's assets were sold by the Receiver, and approximately $400,000 is being held by the Trustee.

When these entities were established, it was expected that Millfield Ltd., Millfield III, MFEV, and PG Vaduz, all of which own or owned horses, would pay boarding fees to Millfield Inc., which would care for the horses. However, Kay Daniels, the farm manager of Millfield Inc., testified in her deposition in the "Divorce Action" that she was unaware of any payments.[28] In fact, it appears that there were few, if any, inter-corporate transfers.[29]

Gucci has claimed that he has had no control over any of the Related Entities. However, his claim has been controverted by the testimony of Ms. Daniels at her deposition. In fact, she said that Gucci insisted that she seek the approval of either Gucci or his girlfriend, Penny Armstrong, for many of the decisions concerning the horses.[30] This was especially true while Gucci sought to keep some of these assets far from the reach of his wife and other creditors.[31]

Additionally, Gucci has created another group of companies which are involved in licensing and design. In *Status Eyes, Ltd. v. Creations Creative Corp., et al.*, Edward Litwak, who is Gucci's licensing agent and friend, testified at his deposition that these corporations were formed as shells and were controlled by Gucci.[32] Moreover, it appears that Gucci established yet another set of corporations to hold various real estate interests. Portwell, a Guernsey corporation, owns three condominium apartments in New York City. Apparently, only Gucci and his family have ever lived in them, and, currently, they are subject to an order of exclusive use and occupancy by Jennifer Gucci, despite the fact that Gucci claimed in the divorce action that they were owned by third parties.

Although the Related Entities were set up as separate and independent corporations, it appears that Gucci owns and controlled each of them through various surrogates and nominees. From 1986 through 1990, Jonathan Hall–Tipping ("Tipping"), a stockbroker and friend of Gucci's, served as an officer and director of PG Yorktown, PG Properties,

---

**28.** Trustee's Motion for Substantive Consolidation, hereinafter Trustee's Motion, Ex. D, at 97–98.

**29.** Id., at 92–97.

**30.** *Id.*, Ex. E.

**31.** Id., at 160–161.

**32.** *Id.*, Ex. H.

Millfield Inc., and Millfield III.[33] At the time he assumed these positions, Tipping provided Gucci with undated letters of resignation.[34] In fact, in his deposition, Tipping testified that he acted as a surrogate for Gucci. Moreover, although Tipping was the sole shareholder of PG Yorktown and PG Properties and was a shareholder of Millfield Inc., Millfield III, and PG Portwell, he testified that it was Gucci, in reality, who owned these entities.[35] After Tipping resigned from his positions, other friends and agents of Gucci assumed these roles.

Finally, both Justice Gangel–Jacob and Judge Leval determined that Gucci controlled most of the assets that are the subject of these motions.

## III. DISCUSSION

### A. Motion to Dismiss

#### 1. Bad Faith Standard Under 11 U.S.C. 1112(b)

Movants seek to have the chapter 11 Gucci Cases dismissed as having been filed in bad faith under 11 U.S.C. § 1112(b), which states:

> (b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, which ever is in the best interest of creditors and the estate, for cause, including—
>
> (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
>
> (2) inability to effectuate a plan;
>
> (3) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (4) failure to propose a plan under section 1121 of this title within any time fixed by the court;
>
> (5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or modification of a plan;
>
> (6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;
>
> (7) inability to effectuate substantial consummation of a confirmed plan;
>
> (8) material default by the debtor with respect to a confirmed plan;
>
> (9) termination of a plan by reason of the occurrence of a condition specified in the plan; or
>
> (10) nonpayment of any fees or charges required under chapter 123 of title 29.

11 U.S.C. 1112(b).

■ I am not limited to the ten, nonexhaustive, enumerated grounds in 11 U.S.C. § 1112(b)(1)–(10) for finding cause. *In re Cardi Ventures, Inc.*, 59 B.R. 18, 21 (Bankr. S.D.N.Y.1985). "[T]he precise perimeters of 'cause' are intentionally omitted from the statute so as to afford maximum flexibility and, among other things, to enable a bankruptcy court to dismiss a chapter 11 case for any reason cognizable to the equity power and conscience of the court." *In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr.E.D.N.Y. 1988); *In re Coffee Cupboard Inc.*, 119 B.R. 14, 17 (E.D.N.Y.1990).

■ Although bad faith is not included as one of the ten listed categories under 11 U.S.C. § 1112(b)(1)–(10), it has been established that a lack of good faith in filing a chapter 11 petition may constitute cause under 11 U.S.C. § 1112(b). *In re HBA East, Inc.*, 87 B.R. at 258; *In re 299 Jack–Hemp Associates*, 20 B.R. 412, 413–14 (Bankr. S.D.N.Y.1982) In addition, the "cause requirement of 1112(b) may be satisfied by showing a subjective bad faith on the part of the debtor, in that the motive for filing the petition was to abuse the reorganization process, *coupled with an objective element that reorganization is in fact unrealistic.*" *Carolin Corp. v. Miller*, 886 F.2d 693, 700–02 (4th Cir.1989) (Emphasis added). Once the debtor's good faith is put into question, the debtor has the burden of proving good faith. *In*

---

**33.** Id., Ex. J and K.

**34.** *Id.,* Ex. L.

**35.** *Id.,* Ex. J at 89–90.

re Copy Crafters Quickprint, Inc., 92 B.R. 973, 985 (Bankr.N.D.N.Y.1988); *In re Scheffler*, 86 B.R. 576, 580 (Bankr.W.D.Wis.1986) (quoting *In re Setzer*, 47 B.R. 340, 345 (Bankr.E.D.N.Y.1985)).

Although bad faith is often cited as cause, generally such cases are really dismissed for specific reasons that make chapter 11 relief inappropriate under the circumstances, and usually those reasons constitute one of the specific causes identified in section 1112(b). *In re Foundry of Barrington Partnership*, 129 B.R. 550 (Bankr.N.D.Ill.1991); *In re Mandalay Shores Co–Op. Housing Ass'n, Inc.*, 63 B.R. 842 (N.D.Ill.1986); *In re N.R. Guaranteed Retirement, Inc.*, 112 B.R. 263 (Bankr.N.D.Ill.1990), *aff'd*, 119 B.R. 149 (N.D.Ill.1990). "Section 1112(b) and its associated "good faith" doctrine are primarily concerned with the underlying question whether reorganization is the proper course of action in a particular debtor's case. On that score, dismissal of a chapter 11 petition—like dismissal of any lawsuit—is not imposed principally as a sanction for bad intentions or obstreperous behavior. Instead, dismissal flows from the legal determination the debtor is not entitled to the remedy it seeks." *In re Foundry of Barrington Partnership*, 129 B.R. at 555.

■ The Bankruptcy Court has wide discretion to determine if cause exists, and how to ultimately dispose of the case. *In re Coffee Cupboard, Inc.*, 119 B.R. at 18; *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817 (Bankr.N.D.N.Y.1989), *citing* S.Rep. 989, 95th Cong., 2d Sess. 117–18, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5903–04; H.R.Rep. No. 595, 95th Cong. 1st Sess. 405–06, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6361–62. This discretion should be "legal discretion, rather than one merely at will," or "one that only expresses the court's own notion of equitable principles." *In re Coffee Cupboard, Inc.*, 119 B.R. at 18. Because no single factor is determinative of the issue of good faith, bankruptcy courts have had to examine the facts and circumstances of each case in light of several established guidelines or indicia. *In re HBA East, Inc.*, 87 B.R. at 259. "Determining whether the debtor's filing for relief

is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, [and] motives.... Findings of lack of good faith in proceedings based on ... [Section] 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum." *Id.*, citing, *In re Little Creek Development Company*, 779 F.2d 1068, 1072 (5th Cir.1986).

■ Factors relevant in examining whether a chapter 11 petition has been filed in good faith include whether the debtor has any assets, whether the debtor had an ongoing business to reorganize, and whether there was a reasonable probability of a plan being proposed and confirmed. *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir.1985); *In re International Oriental Rug Center, Inc.*, 165 B.R. 436, 442 (Bankr. N.D.Ill.1994).

Some of the factors which the court in *In re Little Creek Development* believed should be considered in determining whether bad faith exists were whether: i) the debtor has one asset; ii) that asset is encumbered by liens of secured creditors; iii) the pre-petition conduct of the debtor has been improper; iv) there are generally no employees except for principals; v) there is little or no cash flow; vi) there are no available sources of income to sustain a plan of reorganization; vii) there are few if any unsecured creditors; viii) the property has been posted for foreclosure; ix) the debtor and one creditor have come to a standstill in state court litigation and the debtor has lost or has been required to post a bond which it cannot afford; and x) the filing of the petition effectively allows the debtor to evade court orders. *In re Little Creek Development*, 779 F.2d at 1072.

■ Applying these factors, and taking into consideration the appointment of the Trustee, who has stepped into the Debtor's shoes and whose good faith is not questioned, and the position of the many creditors, I find that these petitions should not be dismissed.

■ As an initial matter, I believe that the appointment of the Chapter 11 Trustee has in many respects altered the emphasis which

may be placed on Gucci's pre-petition activity. In fact, at the time of the United States Trustee's motion to appoint a chapter 11 trustee, not one of the movants objected. Indeed, the facts upon which the movants rely on are the same facts on which the appointment of the Trustee was based. Although I do not agree with the Trustee's contention that once a Chapter 11 Trustee is appointed, only he may move for an order under 11 U.S.C. § 1112, *See, In re Abijoe Realty Corp.*, 943 F.2d 121, 125 (1st Cir.1991) (Creditor has standing to request dismissal under 11 U.S.C. § 1112), the facts before me do not warrant dismissal.

One of the considerations in appointing the Trustee was to obtain a clearer picture of Gucci's assets and creditors. I postponed decision of these motions in order to determine who the creditor body was and to allow all creditors an opportunity to be heard. With the exception of the movants, the rest of the creditor body, along with the United States Trustee, appears to oppose dismissal.

In addition, the Trustee, cloaked with his unique powers, has already made significant strides in determining the number of creditors and claims, marshalling Gucci's assets and administering the cases. What is of most importance is the fact that the Trustee, in his fiduciary role, has guarded the interests of all the creditors. If these cases were dismissed, assets might disappear and there would be a race to the courthouse with these movants in the lead.

I have wide discretion to determine this issue, and to dispose of the case. *In re Coffee Cupboard, Inc.*, 119 B.R. at 18. In doing so, I must consider a multitude of factors. Although Gucci's pre-filing behavior has been far from exemplary, this case does not fall within the *Little Creek* factors. The basis of the "bad faith" rule is to protect creditors from a debtor's bad acts. Here the creditor body is better protected if the case is not dismissed. The appointment of the Trustee effectively and efficiently protects the creditors as a whole.

This is a case which involves many assets throughout the world, some which are of great value. There are creditors whose interests will be protected in a bankruptcy proceeding, but will be unable to protect themselves if these cases are dismissed. Consideration of the creditors' interests is paramount because "[in] ruling on a motion to dismiss a case for lack of good faith, the Court must be mindful of, and attempt to preserve, the delicate balance of interests fashioned by Congress under Chapter 11 of the Bankruptcy Code." *In re International Oriental Rug Center, Inc.*, 165 B.R. at 442. Leaving these cases in court and the assets under the control of the Trustee is the best way to "preserve the delicate balance of interests."

The movants have not shown that the debtor does not have the ability to formulate a plan of reorganization, although this factor is important in determining whether a case should be dismissed, *Carolin Corp v. Miller*, 886 F.2d at 700–702. In any event, that responsibility has fallen on the Trustee who appears to be well on the way to reorganization.[36]

"[C]ourts which have considered whether such a requirement [of good faith] still exists have uniformly held that a bankruptcy court, sitting as a court of equity, possesses the inherent power to determine whether a debtor has improperly invoked its jurisdiction by coming into court in bad faith." *In re Coastal Nursing Center, Inc.*, 164 B.R. 788, 793 (Bankr.S.D.Ga.1993); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988); *Matter of Little Creek Development Co.*, 779 F.2d 1068 (5th Cir.1986). Moreover, "a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons ... available only to those debtors *and creditors* with clean hands." *In re Coastal Nursing Center, Inc.*, 164 B.R. at 793–94 quoting *In re Little Creek Development Co.*, 779 F.2d at 1072. (Emphasis added) Although Gucci may not have filed his

---

**36.** 11 U.S.C. § 1106(5) states that a Trustee shall:

(5) as soon as practicable, file a plan under section 1121 of this title, file a report of why the trustee will not file a plan, or recommend conversion of the case to a case under chapter 7, 12, or 13 of this title or dismissal of the case.

cases with the best of intentions, any damage from his bad acts has been ameliorated by the appointment of the Trustee. The decision here requires a balance of the interests of the debtor and the creditors, as well as a consideration of the integrity of the bankruptcy process. Here, the balance tips against the movants. Therefore, the Status Eyes' and Trackwise's motions to dismiss on the grounds of bad faith are denied and Trackwise's motion for sanctions is also denied.

### 2. Basis of the Trustee to File Related Entities

Stancato moves to have the Related Entities cases dismissed on the grounds that the Trustee did not have the statutory authority to file them. Stancato's challenge is not that the Trustee did not exercise proper business judgment in filing these cases, but that the Trustee had no authority to file.

■ Generally, a creditor may not challenge a corporate filing on the ground that it was not properly authorized. *In re John Hicks Chrysler–Plymouth, Inc.*, 152 B.R. 503 (Bankr.E.D.Tenn.1992); *In re Professional Success Seminars International, Inc.*, 18 B.R. 75 (Bankr.S.D.Fla.1982); *In re Southwest Equipment Rental*, 152 B.R. 207 (Bankr.E.D.Tenn.1992), *but see, In re Giggles Restaurant, Inc.*, 103 B.R. 549 (Bankr.D.N.J. 1989); *In re A–K Enterprises, Inc.*, 111 B.R. 149 (Bankr.N.D.Ohio 1990).

■ However, in determining whether a creditor has standing to seek a dismissal, the court should consider whether the party raising the challenge has a stake in the case sufficient to entitle it to be heard, taking into account the policies underlying the principles it invokes and the scope of protections intended to be afforded by those policies. *In re Consolidated Auto Recyclers, Inc.*, 123 B.R. 130, 138 (Bankr.D.Maine 1991); *In re Giggles Restaurant*, 103 B.R. at 555–56.

■ Stancato and Status Eyes are both creditors of Gucci, Millfield and PGAEV.[37] They base their challenge to the Trustee's authority, not as creditors of one of the Related Entities, but as creditors of the previously filed cases. Unlike the creditor in *Consolidated Auto Recyclers* who was a creditor of both the debtor and the subsidiary, as well as the majority shareholder in the subsidiary, who was "in a far different position than a general creditor of the estate who is otherwise a stranger to the debtor entities" *In re Consolidated Auto Recyclers, Inc.*, 123 B.R. at 138, these movants do not have the requisite standing to challenge the Trustee's authority. I, therefore, must deny the motions to dismiss the Related Entities cases.

Notwithstanding the fact that these movants do not have standing to challenge the Trustee's authority to file the Related Entities, a consideration of their motions on the merits would lead me to the same result.

■ The powers of a bankruptcy trustee are extensive. A trustee is accountable for all property received, has the duty to maximize the value of the estate, is directed to investigate the affairs of the debtor, and is empowered to sue officers, directors and other insiders to recover, on behalf of the estate, fraudulent or preferential transfers. *See generally*, 11 U.S.C. § 704 and § 1106; *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). A chapter 11 Trustee, like any trustee, steps into the shoes of the Debtor, with all of the rights and responsibilities of the Debtor. *Id.* Here, the Trustee stepped into the shoes of Paolo Gucci. Gucci controlled a vast web of interrelated companies, corporations and assets, including the Related Entities. It would have been proper for Gucci to file cases for anyone of those entities, therefore, so can the Trustee.

### 3. Substantive Consolidation

■ The Trustee has moved for substantive consolidation of all of the debtors' estates. The power to consolidate is derived from the court's general equitable powers as set forth in 11 U.S.C. § 105. 5 L. King, *Collier on Bankruptcy*, ¶ 1100.06 at 1100–34 (15th Ed.1994). "The power to consolidate is one arising out of equity, enabling a bank-

---

**37.** Stancato claims to be the owner of the shares of Licensing by Paolo, a fact in dispute, and

Status Eyes claims to have a judgment on most of Gucci's assets, which is also in dispute.

ruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation." *In re Continental Vending Machine Corp.,* 517 F.2d 997, 1000 (2d Cir.1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976). Additionally, the First Circuit stated that:

> ... substantive consolidation merges the assets and liabilities of the debtor entities into a unitary debtor estate to which all holders of allowed claims are required to look for distribution ... [T]he party requesting substantive consolidation must satisfy the bankruptcy court that, on balance, consolidation will foster a net benefit among all the holders of unsecured claims. Thus, the order for substantive consolidation, ... constitutes implicit determination by the bankruptcy court that any inequity to particular claimants would be overborne by the benefits to claimants generally.

*In re Hemingway Transport, Inc.,* 954 F.2d 1 (1st Cir.1992). The purpose of consolidation is "to insure the equitable treatment of all creditors." *In re Murray Indus.,* 119 B.R. 820, 830 (Bankr.M.D.Fla.1990).

■ The relationship between the entities for which consolidation is sought is extremely important. Although it is not a requirement that all the entities be debtors, it is most often the case that they are. 5 L. King, *Collier on Bankruptcy,* ¶ 1100.06 at 1100–35.

■ In deciding whether an application for substantive consolidation should be granted, the court should consider certain factual predicates. The Second Circuit, in a case not approving consolidation, set forth some of them. Essentially, they are variants on two critical factors:

> (1) whether creditors dealt with entities as a single economic unit and did "not rely on their separate identity in extending credit;" and
>
> (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

*In re Augie/Restivo Baking Co.,* 860 F.2d 515, 518 (2d Cir.1988).

■ The arguments in support of consolidation rest heavily on the fact that these corporations are essentially alter egos of Gucci. Two other Judges, Justice Gangel–Jacob and Judge Leval, each determined that to be the case. I must honor those factual determinations. "The records and judicial proceedings of any court of any [state], shall be [admitted] in other courts within the United States and its Territories [and] shall have the same full faith and credit in every court within the United States[.]" 28 U.S.C. § 1738. This statute has been found to expressly require bankruptcy courts to honor state court decisions. *See, e.g., Bowers v. Connecticut Nat. Bank,* 78 B.R. 388 (D.Conn. 1987), *appeal dismissed,* 847 F.2d 1019 (2d Cir.1988). The seminal Supreme Court test for res judicata is:

> When a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Cromwell v. County of Sac,* 94 U.S. 351, 352 [24 L.Ed. 195] (1877). The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatsoever, absent fraud or some other factor invalidating the judgment.

*Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948).

Indeed, it is interesting to note that Status Eyes, which argued in the District Court that the Related Entities were alter egos of Gucci and that Gucci "operated as a single enterprise entity," now argues that they have legitimate and independent existence.

■ It is abundantly clear to me that all of these entities were alter egos of Gucci, and that Gucci's intent in establishing them was to shield his assets from his creditors. The entanglement of all of the Related Entities further supports this position. We have entities owning horses, which are cared for by a second entity but live on the property of a third entity. What remains constant, howev-

er, is that all of these entities are controlled by one individual, Paolo Gucci. Indeed, the two parties who object to this motion have failed to prove in their substantial submissions that they relied on any of these entities as a single economic unit. Indeed, their papers seem to prove the opposite.

Status Eyes claims that creditors will be prejudiced by substantive consolidation. However, Status Eyes fails to put forth facts sufficient for me to make a determination that creditors will, indeed, be prejudiced by substantive consolidation.

Moreover, I find Status Eyes' arguments on behalf of the creditor body unpersuasive where the other creditors, including the Creditors' Committee, who have appeared on this motion, are in support of the Trustee's motion for consolidation. It appears that the only creditor whom Status Eyes believes will be prejudiced is itself, and it does not even make a clear showing of that. Indeed, even if it were found that some creditors may be prejudiced, that, in of itself, would not necessarily defeat the motion because "[a]ny potential prejudice to creditors ... and affiliates that may result from substantive consolidation ... is greatly outweighed by the much greater for prejudice, harm and waste if substantive consolidation is not ordered. Substantive consolidation will preserve the secured status of valid ... liens ... not otherwise avoidable by the Trustee while allowing unsecured creditors to share in all other assets without the increased costs of administering separate estates." *In re Tureaud,* 45 B.R. 658 (Bankr.N.D.Okl.1985), *aff'd,* 59 B.R. 973 (N.D.Okl.1986) Without substantive consolidation, many valuable assets may disappear and that is certainly a greater prejudice to creditors and a concern of this court. The Trustee's motion is granted.

Parties are directed to settle an order.